**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MINK–DAYTON, INC., Respondent.**

**No. 18605.**

United States Court of Appeals
Sixth Circuit.

Sept. 17, 1969.

Peter Kinzler, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Herman M. Levy and Peter Kinzler, Attorneys N.L.R.B., Washington, D. C., on brief, for petitioner.

Dean E. Denlinger, Dayton, Ohio, Lee M. Modjeska, David G. Miller, Smith & Schnacke, Dayton, Ohio, on brief, for respondent.

Before EDWARDS and McCREE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McCREE, Circuit Judge.

This case is before the court upon the petition of the National Labor Relations Board for enforcement of its order against respondent. The Board's Decision and Order are reported at 166 NLRB No. 79 (1967).

Respondent, Mink-Dayton, Inc., is located in Dayton, Ohio and is engaged in

the design and fabrication of metal products. Since 1961 it has been the object of at least four organizational campaigns conducted by three different unions. During 1961–62 the UAW [1] distributed literature and solicited signatures on authorization cards, but apparently failed to obtain enough cards to petition the Board for an election. Beginning in September, 1962, the IUE [2] solicited signatures on authorization cards and in December of that year it requested recognition, claiming to represent a majority of respondent's employees. Respondent refused to recognize the union and in an election held on January 31, 1963 the IUE was defeated by a vote of 61 to 24. In the fall of 1964 the Sheet Metal Workers International Association began distributing literature and by January 13, 1965 had requested recognition as the employees' bargaining representative. Once again respondent declined and suggested an election. The election was held on February 5, 1965 and the union was defeated by a vote of 33 to 27. Less than a year later the Sheet Metal Workers again inaugurated an organizational drive, and this last campaign spawned the present litigation.

On February 7, 1966 the union sent respondent a telegram in which it claimed to represent a majority of the company's employees and requested recognition for the purpose of engaging in collective bargaining. The company president responded the same day and, citing past experience with requests for recognition based on authorization cards, declined to recognize the union. One week later the union filed a petition for an election with the Board. The hearing on the petition was held on March 15, 1966 and a Direction of Election was issued by the Regional Director. Prior to the hearing, a union representative mentioned to respondent's president the union's

desire to negotiate, but apparently received no immediate response.[3]

The election was held on May 13, 1966 after a spirited campaign and the union was defeated by a vote of 39 to 38. Thereupon, the union filed unfair labor practice charges with the Board, in which it alleged violations by the company of Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act as amended, 29 U.S.C. §§ 158(a) (1) and 158(a) (5).

The Board, which adopted the findings and conclusions of the Trial Examiner, found that on February 7, the date of the union's first demand for recognition, the union possessed only 44 valid authorization cards for a unit consisting of 89 employees. However, the Board also found that the remarks of the union representative prior to the hearing on March 15 constituted another request for recognition, and that at this date the union had obtained 52 valid authorization cards. The Board concluded that the company's refusal to recognize the union on this latter date [4] was not motivated by a good faith doubt with regard to the union's majority status but rather by a desire to gain time within which to thwart the union's organization efforts, and that the company's action therefore constituted a violation of Section 8(a) (5). In addition, the Board found that the company had engaged in various practices during the election campaign that violated Section 8(a) (1). The Board ordered the company to cease and desist from the unfair labor practices, to bargain with the union upon request, and to post appropriate notices.

The Section 8(a) (1) violations engaged in by the company consisted primarily of thinly veiled threats that unionization would result in the curtailment of existing benefits, the postponement of future benefits and the crea-

---

1. United Automobile, Aircraft and Agricultural Implement Workers of America.

2. International Union of Electrical, Radio and Machine Workers.

3. During the course of the hearing the company made it clear that it still declined to recognize the union.

4. *See* note 3, *supra.*

tion of more restrictive working conditions. The company contends that the statements in question were merely predictions of the economic consequences of unionization and therefore protected by Section 8(c).[5] We find, however, substantial evidence in the record considered as a whole to support the Board's conclusion that these statements contained suggestions of economic reprisals on the part of the company and were more than mere predictions. In deciding whether statements are entitled to the protective cloak of Section 8(c) we:

> "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." N.L.R.B. v. Gissel Packing Co., Inc., et al., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The more difficult issue concerns the Board's finding of a Section 8(a) (5) violation and issuance of a bargaining order. Initially, the company objects to the Board's ruling that the union representative's statements prior to the March 15 hearing constituted a request for recognition. A review of the record, however, discloses substantial evidence to support the Board's finding that the representative adequately conveyed to the company president the union's desire to negotiate as the employees' bargaining agent. Moreover, there is also substantial evidence to support the Board's finding that at the time of this request for recognition the union possessed valid authorization cards from a majority of the employees.

Accordingly, the decisive issue is whether the company still could refuse to accede to the union's request for recognition as of March 15. The Board decided this question prior to the Supreme Court's ruling in N.L.R.B. v. Gissel Packing Co., Inc., et al., 395 U.S. 575, 89 S.Ct. 1918 (1969), and its determination that the refusal was unlawful was based on a finding that the company's action was not motivated by a good faith doubt of the union's majority status but rather by a desire to gain time within which to undermine the union's support. In *Gissel Packing*, however, the Supreme Court decided that an employer's subjective motivation in rejecting a request for recognition is "largely irrelevant." The important inquiry in determining the legality of a refusal to bargain is whether the employer has committed serious unfair labor practices which tend "to undermine majority strength and impede the election process." 395 U.S. at 614, 89 S.Ct. at 1940. If the employer's violations are such that the "possibility of erasing the effects * * * and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight," the finding of a Section 8(a) (5) violation and issuance of a bargaining order are justified. *Id.* 395 U.S. at 614, 89 S.Ct. at 1940. On the other hand, there is "no *per se* rule that the commission of *any* unfair practice will automatically result in a § 8(a) (5) violation and the issuance of a bargaining order." *Id.* 395 U.S. at 615, 89 S.Ct. at 1940 (emphasis added).

We cannot be certain that the Section 8(a) (1) violations committed here are the type that would be likely to preclude the holding of a fair rerun election and therefore support a finding of an unlawful refusal to bargain and the issuance of a bargaining order. We therefore remand this case to the Board for reconsideration and further findings in light of *Gissel Packing*.

The Board's order with respect to the violations of Section 8(a) (1) is enforced and the case is remanded for further

5. Section 8(c) of the NLRA as amended, 29 U.S.C. § 158(c), provides: "The expressing of any views, argument, or opinion, * * * shall not constitute or be evidence of an unfair labor practice * * * if such expression contains no threat of reprisal * * *."

consideration of the alleged violation of Section 8(a) (5).

McALLISTER, Senior Circuit Judge (dissenting).

From a review of the record it appears to me that there was no violation by the company of Section 8(a) (1) or of Section 8(a) (5) of the Act, in engaging in unlawful practices during the election campaign.

This case arises out of the claim of the union, Sheet Metal Workers International Association, Local 224, AFL-CIO, that it had "representation" cards of a majority of the company's employees, and that the refusal of the company to bargain with the union as the representative of the employees on the basis of such "representation" cards constituted an unfair labor practice under Sections 8(a) (1) and 8(a) (5) of the Act.

In three elections in three years for a bargaining agent, the company had prevailed. Subsequent to the last election, the union, after losing, filed an unfair labor practice charge based on the company's alleged unlawful conduct during the last election campaign, maintaining that prior to the election, the company refused to recognize the union which alleged it had "representation" cards of a majority of the company's employees and, therefore, was entitled to be recognized as the collective bargaining agent.

In large part, this controversy arises out of the Board's recognition of the "representation" cards, which were claimed to represent a majority of the employees and, therefore, required the company to recognize such "representation" cards as constituting the union as bargaining agent, instead of ascertaining the bargaining agent by a secret election.

In N.L.R.B. v. Gissel Packing Company, Inc., 398 F.2d 336 (C.A.4), the court held that authorization cards are such unreliable indicators of the desires of the employees that an employer confronted with a demand for recognition based solely upon them is justified in withholding recognition pending the result of a certification election. As sustaining the foregoing rule, see N.L.R.B. v. Heck's, Inc., 398 F.2d 337 (C.A.4) and General Steel Products, Inc. v. N.L.R.B., 398 F.2d 339 (C.A.4).

In Schwarzenbach-Huber Company v. N.L.R.B., 408 F.2d 236, 249, 250 (1969) (C.A.2), Judge Medina, speaking for the court, forcefully voiced its views on representation cards in the following language:

"This 'representation' card business is an abomination. As presently administered it is a pro-Union device that serves no other purpose than to afford a method by which elections can be by-passed and the Union ushered in without giving the employees individually or collectively any voice in the matter. And this is accomplished by the invention of new *per se* rules of evidence and new standards by which the proofs are to be evaluated, that fly in the face of common sense and elementary concepts of justice and fair play.

"The very keystone of the Act is Section 7.

"Rights of Employees

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3).

"The invention and implementation of a scheme by which employees can

be befuddled into thinking they are asking for a free election at which each can cast a secret ballot either for or against the Union, whereas they are in fact held to be signing away this very right without knowing they are doing so, seem to us to be a clear violation of Section 7. By the same token the bargaining order in this case nullifies the beneficent purposes of the Act and in no possible way can be said to effectuate the purposes of the Act. The forgotten man seems to have been the employee who was one of those who comprised the unit of production and maintenance workers in the Company's Juniata Plant."

However, the Supreme Court, in the consolidated cases of N.L.R.B. v. Gissel Packing Company, N.L.R.B. v. Heck's, Inc. and General Steel Products, Inc. v. N.L.R.B., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, decided June 16, 1969, reversed the ruling of the Court of Appeals for the Fourth Circuit, which had held that the companies involved were not obliged to deal with unions on the basis of authorization cards. An employer, accordingly, confronted with a demand for recognition, as a bargaining agent, based on authorization cards signed by a majority of the employees of an appropriate unit for bargaining, is not justified in withholding such recognition on the ground that there has not been an election, and a bargaining agent thereafter certified as a result thereof.

We then come to the discussion of Section 8(c) of the Act, since it is that provision of the law that here determines whether the company violated the provisions of the National Labor Relations Act by making thinly-veiled threats:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threats of reprisal or force or promise of benefit."

The Board held that the alleged Section 8(a) (1) violation, engaged in by the company, consisted primarily of threats of economic reprisals if the union won the election; and, in the accompanying opinion, it is stated that there is substantial evidence in the record as a whole to support the Board's finding that the statements made by company officials were thinly-veiled threats and, therefore, violative of Section 8(a) (1).

What were these statements? Did they consist of threats of economic reprisals, and were they "thinly-veiled threats" violative of Section 8(a) (1)? The so-called thinly-veiled threats are of different provenance: (1) the statement of a foreman, Wesley Bryant, to an employee, Brown Gwin, and (2) statements made in the course of a speech by the president of the company, Mr. Vincent Materese, to the employees a little more than twenty-four hours before the election, and in a letter which Mr. Materese sent to every employee a day or two before the election.

We discuss, then, the two different grounds upon which the statements relied upon by the Board which it is claimed show threat of reprisal, or force, or promise of benefit.

First, the statement of foreman Wesley Bryant. All of foreman Wesley Bryant's statements were made to a single employee, Brown Gwin. The first time Bryant and Gwin discussed the question of the union, Gwin told Bryant that he was opposed to the union although he had signed the representation card. Obviously, foreman Bryant felt that he and Gwin were on the same side of the controversy because afterward Bryant frequently talked about his views of the union to Gwin, and to Gwin alone. How can it be said that any statement of foreman Bryant to Gwin was an expression containing a threat of reprisal, or force on the part of the company against Gwin, when Gwin gave Bryant to understand that Gwin, himself, opposed the union and that they both entertained the same views. Bryant testified that he never said anything in the way of a

threat of reprisal or force to Gwin, and answered his questions only after Gwin had previously told him that he opposed the union—and this should be considered in the light of the fact that no one claimed that Bryant ever spoke to any other employee on union matters. Moreover, Gwin, after stating that, on a certain occasion, he had no complaint against the company because of its failure to grant him a raise of a nickel a month, testified:

"Q. But as far as you knew as far as you had told the company you were against the union, is that correct?

A. Yes.

Q. Why did you tell them that?

A. Well, Mr. Bruner, he asked me once—I said—Well, my wife works. She brings home 65, $70. I said—I bring that much home, and we make pretty good. I said, I am not interested in it because I can't see paying the $4 mostly to see what he was going to say.

Q. Were you trying to see what you could make him say?

A. What he was going to talk about. He always come to me and talked."

Mr. Bruner had said nothing to Gwin, favorably or unfavorably, about the union, either before Gwin's statement that he opposed the union, or afterward. This is undisputed.

The foregoing shows that, on the one occasion when Gwin engaged in conversation with a representative of the company, and on the other occasion when he engaged in conversation with a foreman of the company, he unqualifiedly told them that he was against the union.

From the foregoing there can be no basis for holding that Bryant's statement to Gwin constituted any expression containing a threat of reprisal, or force, or promise of benefit on the part of Bryant or the company and, accordingly, does not violate Section 8(a) (1) of the Act.

We proceed, then, to the claim that through the speech of Mr. Materese, the president of the company, and his letter to all the employees, the company violated Section 8(a) (1) of the Act. We find no expression from the president of the company in his speech to the employees or in his letter to them of any threat of reprisal, or force, or promise of benefit; and, if his speech and letter do not contain any threats of reprisal, or force, or promise of benefit, the speech and letter are justified under Section 8(c) of the Act heretofore mentioned.

Cases in which it is claimed that the company has expressed views, arguments, or opinions constituting an unfair labor practice because they contain threats of reprisal, or force, or promise of benefit "are to be considered 'against the background of a profound * * * commitment to the principle that debate * * * should be *uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks.*'" Linn v. United Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 663, 15 L.Ed.2d 582. (Emphasis supplied.)

The statements of the company, of which the union complains are, as instances, shown in the margin.[1]

---

1. President Materese's letter to the employees stated:
   "We *were* making great progress on the Pension Plan—spending hours with your Shop Committee and insurance companies, working out the best type of plan for you. Unfortunately, because of present union activities and legal restrictions imposed because of them, further work and discussions have been dropped."
   "STRAIGHT TALK about your future at Mink-Dayton:
   * * *

   "WHAT CAN THE UNION GET YOU THAT YOU DO NOT ALREADY HAVE, OR CAN GET FOR YOURSELF?

   "Everyone got across-the-Board increases during the past year. *Everyone* got merit increases. With the Union, merit increases would go out the window. And you'd have to nego-

We see, in these instances, manifested no intention to interfere with the employees' rights to decide the election free from coercion. In Schwarzenbach-Huber Company v. N.L.R.B., *supra,* the president of the company said in a speech to the employees:

"A group of hotheads among you has now decided to exploit a situation which for over a year has been highly explosive. This group tells you that by joining the TWUA you will be getting better earnings, better working conditions, better benefits and, of course, job security!

"With 20 years of this business and numerous union elections (3 of them right in Juniata) under my belt, I know all this to be empty promises. *It has long been Company policy to pay at Juniata as well or better than our competitors.* If a raise, additional benefits, pensions, or whatever are truly in the cards, then you will get them! For this you need no TWUA, no $60.00 a year deducted from your pay-check. What you will not get and what the TWUA cannot get for you are benefits that lead to excessive costs. *No company can survive selling its product at a loss,* and this is exactly what we have been doing these last 8 months.

"No matter what the TWUA may promise you, the Juniata record is a darn good one. Compare your wages, your holidays, your benefits, to industry figures, *to those in our own Front Royal mill for that matter!*

Look at Juniata's 20-year record of around-the-clock employment. And the TWUA? *Why isn't there a single major textile operation left in the northeastern states?* Is that the kind of job security the union keeps talking about?

"Why is it that today virtually all our competition is located in the South? Simple enough! The mills down there feel safe from the bickering, dissension and unreasonable demands that come with the TWUA. *Remember Altoona Rayon?* * * *

"Many of you have known me for a long time. I have always been partial to this Juniata mill. I have never wilfully misled you. I am convinced that the Company record justifies your confidence. Now, as in the past, I firmly believe you have *absolutely nothing to gain* by voting in the union."

The court, in Schwarzenbach-Huber Company v. N.L.R.B., *supra,* said, in reference to the above statements:

"The employees knew, as does everybody else, that union demands often cause increased costs which render it difficult or impossible for management to continue operating an enterprise that is already losing money."

More to the point, in the instant case the Trial Examiner concluded that both "Materese's letter and his speech show them to be *estimates* of what will occur if and when the employees select the union." (Emphasis supplied.)

tiate thru [sic] the Union *for all* other increases. * * *

"We were well on the way with a fine pension plan to be developed to meet your individual needs. But union activities forced us to drop all discussions. * * *

"WHAT YOU WILL SURELY LOSE SHOULD THE UNION TAKE OVER.

"You'll lose your right to complete a full day's work when there's nothing to do in the rigid job classification which the Union sets up for you.

"Should the Union get in, you may also be threatened periodically with crippling

strikes—long periods during which you'll get no pay at all, when customers may go elsewhere. * * *

* * * * *

"Should the Union get in, you'll be held in a straightjacket by a long involved legal contract. There will be no 'ifs' or 'buts'. You'll have to live up to a contract which fixes your wages, your job classification, the exact way which you move and turn. There's no flexibility and no place for reason and individual consideration in a legal document such as *you'll have to sign*—just to be able to pay dues."

Are such personal views, assuredly personal *estimates*—and so found to be—interference with the employees' rights to select the union free from coercion? Obviously not.

The Materese statement, of which so much is made, that if the union were selected by the employees "you can't go upstairs [to the office] and borrow 25 bucks without interest * * *," is not a coercive threat. The employees were never entitled, by right, to borrow money from the company without interest. Such a practice was indulged in only through the good will of the company. And if, after a union was selected, the company continued to lend money without interest to the employees—or some of them—such a practice could certainly be considered an unfair labor practice against the union in any future election.

Mr. Materese's statements and letters to the employees cannot be held to be interference, restriction, or coercion of the employees on the part of the company. Everyone presumably knew that the statements were true. If the company had continued to spend hours with the shop committee to work out the *best* plan for the employees, during the period leading up to the election, the company could well have been accused by the union of promising benefits to the employees which would constitute the basis of an unfair labor practice brought by the union. Moreover, the further caution of Mr. Materese that the selection of the union would mean rigid job classifications was, as far as the record goes, true in this case as it has been in so many other N.L.R.B. cases. Additional statements that the company had to give up the pension plan until this thing blows over; that the union negotiators would find out how much they could squeeze out of a stone, and they'll get as much as they can squeeze and no more; and that there are no job transfers in a union shop—none of these statements can be held to violate Section 8(c) of the Act, being as they are, either true statements, or uninhibited, robust, and wide-open arguments, including ve-

hement, caustic, and unpleasantly sharp attacks.

Did the expression of the company's president of any views, argument, or opinion, or the dissemination thereof in written, printed, graphic, or visual form, contain any threat of reprisal, or force, or promise of benefit? We are of the opinion that clearly they did not; and the Trial Examiner's conclusion that these statements were only estimates "of what will occur if and when the employees select the union" entirely substantiates this view that they did not contain any threat of reprisal, or force, or promise of benefit.

Can any of the statements of Mr. Materese be considered more than uninhibited, robust, and wide-open debate, and do they include anything more than vehement, caustic, and sometimes unpleasantly sharp attacks? If they do not, they are protected and unassailable under Section 8(c) of the Act. We are of the opinion that such statements are so protected.

The Trial Examiner found that the letters sent out to the employees by the *union* contained vituperation and an assortment of language more suited to a back-alley fight when "it accused the employer of double-dealing, anti-unionism, and favoritism, interspersed with other invictives which President Materese claims was the provocation for the letter he wrote and the speech he gave. No point would be served by dignifying the union propaganda by reproduction here. It is sufficient merely to say that none of it justified Respondent in wallowing rhetorically on the same level."

All of the foregoing shows that the debate between the company and the union, in the language of Section 8(a) of the Act included "caustic, vehement, and sometimes unpleasantly sharp attacks." But such statements by a respondent are protected by Section 8(c).

President Materese's statements and letters, according to the Trial Examiner, were only "his estimates of what will

occur if and when the employees select the union."

Moreover, Mr. Materese forcefully stated in his letter to all of the employees just before the election: "If the union gets in, there will be no reprisals on the part of the company, and we will bargain in good faith."

The whole case against the company for a violation of Section 8(a) (1) of the Act rests upon the conclusion of the Board that the statements of Mr. Materese constituted "thinly veiled threats that the employees would suffer economic reprisals." The so-called threats of economic reprisals are so thinly veiled that they are invisible. In fact, they are nonexistent.

In the prevailing opinion it is held that N.L.R.B. v. Gissel, and allied cases, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (decided June 16, 1969) justify the holding of the Board that respondent company violated Section 8(a) (5) of the Act in refusing the union's request for recognition as collective bargaining agent when it was possessed of valid authorization cards from a majority of the employees. This holding is based on the ground, that, since an employer's subjective motivation in rejecting a request for collective bargaining is "largely irrelevant"; and the important inquiry in determining the legality of a refusal to bargain is whether the employer has committed serious unfair labor practices which tend "to undermine majority strength and impede the election process"; and because the possibility of erasing the effects and of ensuring a fair election by the use of traditional remedies, though present, is slight, the finding of a Section 8(a) (5) violation and the issuance of a bargaining order are justified.

Let us resort to other portions of the language in *Gissel* which is less abstract and complicated, and which states the rule of that case equally well. It seems to me that *Gissel* is not controlling or relevant in the instant case. While, as remarked in the prevailing opinion in the instant case, "the Supreme Court decided that an employer's subjective motivation in rejecting a request for recognition is 'largely irrelevant,'" we are not faced with an employer's "subjective motivation" in this case. What the Supreme Court said in its opinion in *Gissel*, may, in certain aspects, be unclear. Nevertheless, it seems not to be unclear as far as it applies to the evidence in this case. Good faith doubt, apparently, may, under some circumstances, arise from subjective motivation; but if representatives of the union actually misrepresented the meaning and proposed use of the so-called representation cards, it follows that the employer would have, not a subjective motivation but, an objective motivation in rejecting a request for recognition. The Supreme Court in *Gissel* stated:

"In resolving the conflict among the circuits in favor of approving the Board's *Cumberland* rule, we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election."

That the language used in the cards was deliberately and clearly cancelled by union adherents with words calculated to direct the signer to disregard and forget the language above his signature appears from the evidence as hereafter outlined.

The Trial Examiner found as a fact that: "Union Representative Rodgers credibly testified that the cards for each of these employees [2] were submitted to him on or shortly after the date indicated

---

2. R. D. Adams Jan. 31, R. N. Boggs Feb. 1, A. R. Herbst Feb. 2, W. H. Herbst Feb. 9, R. G. Masters Feb. 1, W. D. Rodgers Feb. 2, F. E. Viers Jan. 31.

on the cards themselves by the employees, who were soliciting the cards among the employees, as their part in the Union's organizing campaign. These solicitors, Employees Pack, Jesse Newsome, and Prince, each credibly testified, as did Rodgers, that the cards were procured upon their assurance to the employees that the purpose was to authorize the Union to represent them."

This finding is completely without foundation in the evidence and is explicitly contradicted by these employee solicitors for the union.

The conclusive proof that the cards were procured from the employees upon the representation and assurance that they were to be used only to secure an election, and not for the purpose of constituting the union as their bargaining agent, is found in the testimony of Millard Rodgers, the business agent of the union, and those who solicited the employees to sign the cards. Rodgers testified that, at a meeting of the sheet-metal workers and roofers at the Optimists Club, he was approached by Lawrence Pack, an employee of respondent company, who asked if Rodgers would help get them a union at the Mink-Dayton Company. After this request, Rodgers met with Pack the following day and he gave Pack approximately 90 cards, and asked him to get them signed and bring them back to him "and we would go from there." Rodgers further testified that, to his knowledge, some other employees assisted Pack in distributing the cards, namely: Jesse Newsome, Granville Prince, Melvin Knob, and Robert Boggs. Melvin Knob was interrogated before the Trial Examiner as to whether, prior to his signing the card, he was told that the only purpose was to have an election. He testified that he didn't remember, "but I think it was common knowledge that there would be an election if there was a number of cards signed." Knob did not state who gave him the card; but he signed it and returned it to Lawrence Pack. Robert Boggs was not a witness. Rodgers may have mistaken this name

for that of Keith Boggs, who was a witness, and who merely stated that he signed the card and gave it back to Jesse Newsome, or to Larry Pack.

Rodgers testified that he received back practically all of the cards from Lawrence Pack. He remembered only one card that he received from anyone else, namely, one from Marion Sarver.

All of the foregoing proof, then, is to the effect that the union business agent, Rodgers, gave approximately 90 cards to Pack to distribute to the employees and that Jesse Newsome and Granville Prince assisted Pack, and Pack returned the signed cards to Rodgers. They were the only ones distributing the cards, to the employees. The representation made to the employees as to the purpose for which the cards were to be used is to be found only in whatever representations Pack, Newsome, and Prince made to the employees.

Lawrence Pack testified that he told Mr. Kanak and Mr. Collier, employees of respondent company, "what the purpose of the card was." "I said this is for an election." He further testified that he told all employees whom he solicited to sign the cards that "it was for an election * * * only for an election. * * *

"Q. Did you tell anyone, any other employee, what the purpose of the card was?

"A. If I did, it was for an election."

Employee Stover testified that Pack told him the *only* purpose of the card was to get an election.

Employee Newsome testified:

"Q. Did you tell any of the employees what the cards were for?

"A. Well, maybe so, if they asked me, I told them it was for a Union to represent them, *but we had to have an election before.*" (Emphasis supplied.)

Mr. Newsome also filed an affidavit with the Board stating that he told Employee Hayes, when he gave him his card to sign: "I told him that if we won enough men to sign the cards, there

would be an election for a Union and that if a majority of the employees voted for the Union, we will all be members"; and Mr. Newsome further testified that the statements in this affidavit were true.

Employee Granville Prince testified as follows:

"Q. Did you get the card from Mr. Rodgers?

A. I believe I got it from Larry Pack and Jesse Newsome. I don't remember which * * *

Q. Whichever one it was, did they tell you what the purpose of the card was?

A. Well, they said it was to get a Union in, get a vote to get a Union in to negotiate for us.

Q. To get a vote?

A. Yes.

Q. Did they say there would be an election?

A. If they got enough cards * *

Q. What did they say about an election?

A. They said you would have to vote first and if it gets in it gets in, and if it didn't it didn't."

Employee Granville Prince also filed an affidavit stating that at a gathering of some employees and union organizers "it seemed that we were all told about how the cards would entitle us to an election."

Employee Martin stated that during the election campaign he had spoken to Mr. Rodgers and testified:

"Q. Do you recall exactly what he said about an election?

A. Not exactly, no.

Q. Well, I asked you before if you were told by him that the only purpose, if you have enough cards signed you would have an election.

A. Yes."

Other employees who signed the cards testified that it was common knowledge that when they signed them, the purpose was to have an election.

It might seem that the Supreme Court did not take into consideration a common understanding and practice among employees when signing cards presented to them by a union organizer when it stated in *Gissel, supra,* that:

"We cannot agree with the employers here that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else."

Mr. Barrett, a union president, and an employee of the respondent company, testified:

"Well, as far back as 19—— when the Unions—the Roosevelt administration came out to protect the Unions why I was elected president. I knew we had to have an election in the shop before we could represent the employees.

Q. So that was your assumption when you signed the card?

A. Yes."

This was the card which the union now claims constituted it as a bargaining agent, rather than as a request for an election.

Because the only solicitors for the union—Pack, Newsome, and Prince— contrary to the findings of the Hearing Examiner, did not assure the employees that the purpose of the cards was to authorize the union to represent them, but, on the contrary, the testimony and affidavits of Pack, Newsome, and Prince were to the effect that the purpose of the cards was *only* to secure an election, the cards cannot be held to authorize the union to represent the employees as found by the Hearing Examiner, who stated that he could not see the relevance of misleading statements concerning the purpose of the cards.

Here, the evidence by the Board's own witnesses clearly discloses that the printed language on the cards was "deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." N.L.R.B. v. Gissel, *supra.*

The fact that there was no evil or fraudulent intent in so deliberately cancelling the language and directing the signer to disregard and forget the language above his signature is irrelevant. It was what the solicitors for the union, themselves, understood to be the purpose of the cards, and, with such purpose the solicitors were wholly satisfied.

It, therefore, appears from the foregoing uncontradicted evidence, that the union solicitors innocently obtained the signed cards and misrepresented the purpose for which these were to be used. In N.L.R.B. v. Gissel, *supra*, the Supreme Court held: "A bargaining order will not issue, of course, if the union obtained the cards through misrepresentation * * *."

Accordingly, the findings of the Hearing Examiner and the Board that the union, by virtue of such cards, became the designated bargaining agent of the employees, are set aside, and since there was no violation by respondent of either Section 8(a) (1) or Section 8(a) (5), a decree should be entered denying enforcement of the Board's order.