527 F.2d 803
 90 L.R.R.M. (BNA) 3258, 174 U.S.App.D.C. 20,
78 Lab.Cas. P 11,169
 AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL--CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Jimmy-Richard
Co., Inc.,Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
JIMMY--RICHARD COMPANY, INC., Respondent, Amalgamated
Clothing Workers ofAmerica, Intervenor.
 Nos. 74--1608, 74--1668.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 9, 1975.
Decided Dec. 8, 1975.
Rehearing and Rehearing En Banc
Denied Jan. 13, 1976.
 
 Ann Neydon, New York City, for petitioner in No. 74--1608 and intervenor in No. 74--1668. Arthur M. Goldberg and George Kaufman, Washington, D.C., were on the brief for petitioner in No. 74--1608 and intervenor in No. 74--1668.
 John F. Depenbrock, Atty., N.L.R.B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., were on the brief for respondent in No. 74--1608 and petitioner in No. 74--1668.
 Howard Kent Munson, St. Louis, Mo., for respondent in No. 74--1668 and intervenor in No. 74--1608. Charles Alan Seigel, St. Louis, Mo., was on the brief for respondent in No. 74--1668. Edward Greensfelder, Jr., Washington, D.C., also entered an appearance for intervenor No. 74--1608 and respondent No. 74--1668.
 Before TAMM, ROBINSON and MacKINNON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TAMM.
 Opinion filed by Circuit Judge MacKINNON, concurring in part and dissenting in part.
 TAMM, Circuit Judge:
 
 
 1
 This case concerns the enforceability of a bargaining order issued by the National Labor Relations Board against an employer for pre-election unfair labor practices following his refusal to bargain with a union claiming majority status by virtue of authorization cards. This challenge to a NLRB bargaining order is a familiar one despite the Supreme Court's enforcement of a similar order in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We find the facts of this case squarely within the parameters established in Gissel and affirm both the finding of unfair labor practices and the bargaining order.
 
 
 2
 Jimmy Richard Co., Inc. is a Georgia manufacturer of men's and boys' clothing. In April of 1973, Amalgamated Clothing Workers of America, AFL--CIO made a written demand for recognition based on authorization cards signed by a majority of the employees. The demand was refused four days later in a letter claiming the company's good faith doubt as to the union's majority status. The union then filed an election petition with the NLRB which was approved on May 9. After the union lost the June 1 election by a vote of 50 to 42, it filed objections alleging that during the two-week period preceding the election the employer had promised a change in vacation scheduling and an additional paid holiday if the union lost the election, had threatened plant closing or moving, and had interrogated employees and solicited withdrawal of the union authorizations.[1] After a hearing the Administrative Law Judge (ALJ) concluded that the employer's threat to close the plant if the union made unreasonable demands, his manner of notifying selected employees about proposed vacation changes, and his unilateral adoption of the vacation changes following the election violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1970); the ALJ found no merit, however, in the claims of solicitation and interrogation. He further held that the pre-election 8(a)(1) violations, combined with the refusal to accept the union's continuing demand for recognition, constituted a violation of the section 8(a)(5) duty to bargain. Noting the highly coercive nature of threats of plant closing and the very slight possibility of a fair rerun election, the ALJ recommended that the NLRB issue both a cease and desist order and a bargaining order. The NLRB affirmed and issued the recommended orders. Pursuant to section 10(f) of the National Labor Relations Act, the union has appealed the ALJ's finding that the employer had not solicited withdrawal of the authorizations; the NLRB has sought enforcement of its order under section 10(e).[2] In this consolidated appeal, the employer has challenged both the unfair labor practices findings and the issuance of the bargaining order.
 
 
 3
 We affirm the NLRB's adoption of the ALJ's findings as to 8(a)(1) and 8(a)(5) violations in all respects. The record clearly provides substantial evidence to support the finding that the employer, acting through the plant supervisor, informed selected employees that the vacation changes were 'good news'--by inference, a benefit to be enjoyed along with an additional holiday if the union lost the election. I J.A. at 12--15. The record also supports the ALJ's factual determination that the employer assisted employees' revocation of union authorization only upon request of the employees and, therefore, did not engage in impermissible solicitation or interrogation. Id. at 5--8. These were issues of credibility and, as such, were properly left to the ALJ. We also agree that the speeches and individual conversations threatening possible plant closing or moving were not within the narrow sphere of protected employer speech delineated in Gissel. Recognizing 'the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear,'395 U.S. at 617, 89 S.Ct. at 1942, the Court required that any predictions be capable of objective proof of consequences beyond the employer's control. Id. at 618, 89 S.Ct. 1918. We find in this case, as the Court did in Gissel, that 'the Board could reasonably conclude that the intended and understood import of that message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities.' Id. at 619, 89 S.Ct. 1918.
 
 
 4
 Having determined that affirmance of the 8(a)(1) and 8(a)(5) violations is required, we need only resolve whether the Board's bargaining order is consistent with both its policy favoring certification elections and the bargaining order guidelines established in NLRB v. Gissel Packing Co., supra. We believe that it is.
 
 
 5
 In Gissel, the Supreme Court upheld a bargaining order issued against General Steel Products, Inc.[3] The employer had objected to the validity of the cards, but that issue was resolved against him by the trial examiner. Meanwhile the employer had committed unfair labor practices in the pre-election period. In affirming the bargaining order, the Court noted that even 'in less extraordinary cases marked by less pervasive practices,' the Board's expertise entrusted it, and not the courts, with the responsibility for selecting the appropriate remedy. Id. at 612, 89 S.Ct. at 1940 n.32. The Court enunciated three prerequisites for issuance of a bargaining order where the unfair labor practices are not 'outrageous' or 'pervasive': (1) the union at one point had a majority; (2) the employer has committed unfair labor practices; and (3) the possibility of ensuring a fair election by traditional remedies is slight and thus better protected by a bargaining order.[4] The extensiveness of past employer practices, while not necessarily determinative, is a consideration for the Board in balancing the preference for the election procedure with the need to assure a fair election. Id. at 614, 89 S.Ct. 1918.
 
 
 6
 In this case, the ALJ found that prior to employee revocation the union had obtained 59 authorizations out of 94 employees. I J.A. at 16. Although 12 of these authorizations were revoked before the April 16 demand for recognition, leaving 47 out of 94, the findings reveal that before the consent election was approved, the union had again obtained a majority, including one card signed on April 14.[5] Id. at 17--18.
 
 
 7
 The employer's unfair labor practices--coercive threats, promises of benefits, and unilateral changes in employment conditions--occurred after the consent election was approved on May 9 and after the union had obtained majority status. These practices reasonably account for the union's losing the election by the narrow vote of 50 to 42. See generally NLRB v. Dixisteel Buildings, Inc., 445 F.2d 1260 (8th Cir. 1971). The company argues that the close vote indicates that its unfair labor practices were minor and not sufficient to entitle the union to a bargaining order. It seems more logical to conclude, however, that the union's slight majority could have been eroded, and was in fact destroyed, by the employer's threats of closing or moving the plant. Similarly, the promise of an additional holiday made to a small number of employees could have affected some of the six critical votes. The effect of such less pervasive violations on bare majority situations has been acknowledged in NLRB v. OklaInn, 488 F.2d 498, 508 (10th Cir. 1973), rehearing denied (1974) (enforcing bargaining order).
 
 
 8
 The ALJ stated that a threat of plant closing is one of the most serious obstacles to fair elections and found that 'employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order.' I J.A. at 20, quoting Gissel, supra. This finding is sufficient to support a bargaining order, as discussed in the Gissel case. It should be noted again that Gissel does not require a finding that no other remedy could suffice, only that the bargaining order better protects employees' expressed union preference.
 
 
 9
 In Gissel the Court was so reluctant to ignore the Board's expertise in remedying unfair labor practices that it remanded the case to the Board to make the requisite findings that possibly were 'implicit in the Board's decisions below to issue bargaining orders.' 395 U.S. at 616, 89 S.Ct. at 1941. As the Court stated emphatically, '(W)e think it clearly inappropriate for the court below to make any contrary findings on its own.' Id. In this case, the ALJ has made the requisite findings and the Board has approved the findings and the order. It is not for this court to second-guess the Board or to reject its supported findings.
 
 
 10
 We are well aware of the post-Gissel line of cases requiring the Board to make detailed findings to support its conclusion that a bargaining order is the proper method to remedy 8(a)(5) violations. Even in these cases, however, there is support for enforcement where the employer has threatened plant closing and has promised additional benefits. See, e.g., NLRB v. Kaiser Agricultural Chemicals, 473 F.2d 374 (5th Cir. 1973); NLRB v. WKRG--TV, Inc., 470 F.2d 1302 (5th Cir. 1973).
 
 
 11
 Even more convincing is the fact that in Gissel the Court approved the bargaining order entered against Sinclair without a showing of a prior union majority because the facts indicated 'exceptional' or 'outrageous' unfair labor practices. 395 U.S. at 615, 89 S.Ct. 1918. As one commentator has noted, '(S) ome guidance may be had from the fact that the Court found that Sinclair belonged to the 'aggravated,' or first, category, even though the independent unfair labor practices were limited to 8(a)(1) threats.' Platt, The Supreme Court Looks at Bargaining Orders Based on Authorization Cards, 4 Ga.L.Rev. 779, 794 (1970) (emphasis added). If such threats are within the 'exceptional' category, they must also qualify as 'less pervasive violations' that can be remedied by a bargaining order.
 
 
 12
 One additional argument deserves comment. The employer states that the history of two prior elections should defeat the ALJ's finding that the 8(a)(1) and 8(a)(5) violations were so pervasive as to require issuance of the bargaining order. The company states that 'in 1968 and 1969 there were two elections, neither of which resulted in a single unfair labor practice charge.' Jimmy-Richard Co. Br. at 31. The ALJ's report notes, however, that the 1968 election did elicit objections by the union and was set aside by agreement of the parties. I J.A. at 5. See also II J.A. at 70--96. Although this agreement does not, of course, indicate that an unfair labor practice occurred, neither is it strong support for the company's suggestion of an irrefutable history of fair elections. It is true that the company's 1969 election victory did not result in objections by the union and is entitled to consideration by the Board. The ALJ's recognition of the unchallenged election, however, does not mandate that he ignore the present unfair labor practices and the coercive effect of threats of plant closing. After examining the bargaining history, the types of violations, and the election atmosphere, he found that a bargaining order was the proper remedy. We affirm that order consistent with the agency deference expressed in Gissel.
 
 
 13
 So ordered.
 
 
 14
 MacKINNON, Circuit Judge (concurring in part and dissenting in part):
 
 
 15
 While the Board's findings may be found to be supportive of its conclusions as to unfair labor practices, they are wholly insufficient in character and magnitude to justify issuance of a bargaining order in place of the more highly preferred order for another representation election.
 
 
 16
 In terms of getting on with problems of inaugurating regimes of industrial peace, the policy of encouraging secret elections under the Act is favored.
 
 
 17
 Linden Lumber Division v. NLRB, 419 U.S. 301, 307, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). I would thus affirm the Board's findings in all respects except that I would remand the case to the Board to issue an order directing another election.
 
 
 18
 The Board properly decided to dismiss allegations that the Company violated section 8(a)(1) of the National Labor Relations Act by engaging in coercive interrogation and solicitation of employee withdrawals from the Union. The Board, however, contends that there is substantial evidence in the record as a whole to support its findings that the Company violated section 8(a)(1) of the Act by threatening to close the plant if the employees voted for the Union and by promising them benefits if the unit voted against having union representation.
 
 
 19
 The Union first advised the Company on April 12 that it claimed to represent a majority of its employees, to which the Company responded on April 16th that it had a good faith doubt of the Union's claim. The facts related to the invalidity of certain of the signature cards indicate that this doubt was fully justified. The Union thereupon filed an election petition with the Board, and on May 9, with the Board's approval, the Company and the Union executed a Stipulation for Certification Upon Consent Election, which provided for a secret-ballot election to be conducted by the Board. In the ensuing period before the July 1st election the Company sent a letter to its employees, and its president addressed them in a speech to which there was no objection as to content, then or now. The speech discussed the possible burdens of unionization in terms similar to those which the Board now finds objectionable. Thereafter the Company engaged in a number of electioneering practices that were unobjected to and some of those that were objected to by the Union the Board found to have been properly conducted. No employee ever was discharged for union activity and there was no evidence of spying or interrogation. Two prior consent elections had been held at the Company plant with the same union in 1968 and 1969 without any unfair labor practices.
 
 
 20
 The evidence that the Company improperly threatened to close the plant if the employees voted for the union is minimal at best. What the Company did say, through one of its supervisors, was that, if a union should come into the plant and by its demands increase the expenses of the Company to a point that they could not be met, the Company would be required to close the plant. This statement was made in an environment in which the Union, without any basis therefor, was representing to employees, in the solicitation of signatures to union authorization cards, that by voting to have union representation the employees would get 'free insurance' and 'two weeks vacation in the summer.' The additional costs of such programs would obviously involve a substantial increase in the operating costs of the Company. Therefore, it was justified in assuming that unionization of its employees would increase its financial burdens. The extent of this burden was unknown because the union had not articulated the extent of the 'free insurance' it would require, but the Company was fairly entitled to refer to the possible effect of this added cost if it became too high.
 
 
 21
 The claimed promise of benefits by the Company, which the Board found to support a section 8(a)(1) violation, was also based on very marginal considerations and evidence. The alleged benefits consisted of shifting a regular vacation period from Christmastime to July to better accommodate the needs of the Company to produce year-end garment samples. No increase in total vacation time was involved. In addition, it was charged that the Company promised it would give one additional paid vacation on Memorial Day if the unit voted against the Union. However, the testimony to this latter oral representation was meager and came only from five employees who were the most active in union activity.
 
 
 22
 Under such circumstances, the record is insufficient to justify the further action of the Board in issuing a bargaining order in lieu of calling for another representation election. Recently the Supreme Court in Linden Lumber Division v. NLRB, supra, held that where the unfair labor practices do not impair the electoral process, a violation of section 8(a)(5)[1] is not committed simply by an employer's refusal to accept union authorization cards, allegedly signed by employees in the bargaining unit, as evidence of the Union's majority status. Here, the Board has found on the basis of 48 signed cards out of a 94-employee unit, that the Company failed in its obligation to bargain with a union representing a majority of the employees. The loss of one card would destroy the union majority, and there is testimony indicating that some of the signatures to a number of the union authorization cards were obtained by the misrepresentations as to insurance and vacations which the Board countenanced as 'propaganda.' In my opinion, these misrepresentations were particularly egregious because they were completely speculative.
 
 
 23
 In addition, the back of the authorization cards, which were signed by all of the employees whose signatures were obtained, could represent to a reasonable person that a 'collective bargaining agreement between (the) Employer and the Union' was already in effect, when such was not the case. See statement on the back of the cards, which in its entirety read as follows:
 
 
 24
 I hereby authorize my Employer (the Company named on the reverse of this card) to deduct from my wages dues and initiation fees that may be due to the Union (the Union named on the reverse of this card). This authority to make such deduction shall be irrevocable for the period of one year (sic; the word 'or' appears to have been omitted) until the termination date of the collective bargaining agreement between my Employer and the Union, whichever occurs sooner, and I agree, and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year and for the period of each succeeding collective bargaining agreement between my Employer and the Union, whichever shall be shorter, unless written notice is given by me to my Employer and the Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between my Employer and the Union, whichever occurs sooner. If a new worker: this authorization becomes effective at the end of my trial period.
 
 
 25
 App. II 20 (emphasis added). The Union must admit that the foregoing statement was relied upon by every signing employee because the cards constituted the authorization for the check-off of union dues from the employees' salaries. The Board is thus on very questionable grounds in finding that all the signature cards were validly obtained. The majority opinion does not even discuss this basic and pervasive misrepresentation. Meanwhile it opines 'that the union's slight majority could have been eroded, and was in fact destroyed (emphasis added) by the employer's threats of closing or moving the plant,' and relies on this to support its approval of the issuance of the bargaining order. The italicized portion is unsupported by the record. At no point did the ALJ find that any threats were the cause of the putative lost majority--it could just as well have been attributable to the not infrequent impermanence of card majorities. Moreover, the opinion does not recognize or consider to any extent the fact, which must be recognized in this record, that the union majority of card authorizations, and its 42 votes in the election, might have been largely the result of union misrepresentations and promises of uncertain benefits. It is grossly unfair to consider the conduct of an employer on an election result without giving equal consideration to the union conduct in the same election.
 
 
 26
 Furthermore with justification the employer questioned the validity of the signature on a few of the authorization cards. When all these circumstances are considered in light of the fact that the Union never claimed more than 48 signed employee authorization cards in the 94-employee unit, the Board's finding of a union majority appears paper-thin, if not highly questionable. The Board, however, has wide discretion in these matters which must be recognized, and I accede to the exercise of that discretion, but I would not stretch such findings on the unfair labor practices into justification for the Board to issue a bargaining order, because the Board's factual findings do not indicate any substantial impairment of the election process.
 
 
 27
 NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969) recognizes that
 
 
 28
 an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. See Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 274, 85 S.Ct. 994, 13 L.Ed.2d 827 n. 20 (1965).
 
 
 29
 (Emphasis added). Thus, employers are entitled to make certain justifiable economic predictions. Further, bargaining orders are to be issued only on supportable findings.
 
 
 30
 At a minimum, the reasons expressed by the Board for bargaining order findings must be both internally consistent and logical on their face and sufficiently specific to permit appellate courts to relate the facts of the case to the findings. The reasons supporting the bargaining order of the ALJ, and thereby of the Board, fail dismally on both counts. The ALJ's decision regarding the bargaining order is bottomed on his finding that the employer threatened the employees in violation of section 8(a)(1). (App. I 20). At App. I 11--12, the ALJ presents three reasons for his finding on the threats. The first reason is strictly conclusory, with no specificity whatsoever. The reasoning consists of a recitation of disclosures as to financial condition and as to potential bargaining posture not made by the employer. The passage does not even mention (1) why the employer must divulge such information before bargaining starts, or (2) why the burden of proof in this instance shifts to and remains with the employer, nor does the passage mention such matters as, (3) the economic effect on the employer of such union claims as 'free insurance', which insurance would obviously affect the employer's financial condition, (4) why the Union should not proffer evidence on the economic impact on the employer of 'free insurance' and other benefits advertised by the Union, (5) the factors which in the ALJ's view made unavailing the anonymity of secret ballot voting to protect the true expression of choice by the employees, and (6) why the purely contingent statements of the employer, in the face of then abiding national economic conditions, do not bring the employer's statement within the broad protection of the first amendment, as required by the Gissel acknowledgement of predictions 'phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences.' In fact the ALJ does not acknowledge that the company, as well as the Union, has first amendment interests at stake, nor does he appear seriously to credit the fact that an increase in economic burdens can destroy a company's competitive edge and force it to close facilities.
 
 
 31
 The second reason is not addressed to Gissel-permitted predictions by employers, and so is not here apposite. It is addressed to the Gissel exemption for a management decision already arrived at to close the plant.
 
 
 32
 This third reason is inconsistent and illogical on its face: the ALJ writes that the employer (Respondent) was inconsistent in 'telling employees . . . that the Union will make 'unreasonable' demands on Respondent which it cannot afford . . .' (emphasis added), yet, two pages before, the ALJ expressly found that the objectionable statements (referring to the employer representative who spoke) were conditional, i.e., that
 
 
 33
 the plant would close if the Union won the election and made 'unreasonable demands,' in (other cases) that it would if it demanded 'too much money' and in other cases he added language about the company's ability to 'afford' or 'meet' the Union's demands. (Emphasis added).
 
 
 34
 This is the total extent of the ALJ's findings on the objectionable statements. The ALJ thus jumped from imputing to the employer the correctly contingent wording of what might happen if the Union made certain demands to imputing the emphatic and certain phrasing that the Union 'will make' such demands. Worse, in his third reason, the ALJ also argues that if the employer believed that its present employee benefit program matched those of its competitors, then the employer had no reason to fear Union demands. This argument displays an ignorance of ordinary union activity: it ignores the probability that the Union would work to increase the existing benefits at the plant, whatever the level of benefits existing at the time of unionization. It is unlikely that a union would come in and accept status quo. The ALJ's third reason thus unravels.
 
 
 35
 The result is that the Board and the majority in this case put employers in an untenable position, in flagrant disregard of the principles of Gissel. With regard to employer predictions, the heart of Gissel is specificity and objectivity, both as to employer's statements and as to Board analyses supporting bargaining orders. Here, the employer was as specific and objective as possible, given the Union's intonations about vacations and insurance. The Board, on the other hand, here exacts of itself a very low standard of specificity and factual rigor in weighing the bargaining order question--a standard so low that the Board's bargaining order decision in this case is arbitrary and capricious.
 
 
 36
 Under the factual circumstances, it is my view that the Board exceeded its authority in issuing a bargaining order because the facts which supported the unfair labor practices were not of such character and magnitude as to be 'likely to destroy the union's majority and seriously impede the election.' NLRB v. Gissel Packing Co., supra, 395 U.S. at 600, 89 S.Ct. at 1933, cited in Linden Lumber Division v. NLRB, supra, 419 U.S. at 303--04, 95 S.Ct. 429. To this extent I respectfully dissent.
 
 
 
 [1]
 The complaint also accused the employer of granting economic benefits to employees who were known to be anti-union. The preliminary investigation determined that some of the challenged benefits had been conferred in accord with routine business procedures. The ALJ was therefore not concerned with those allegations at the hearing. II J.A. at 12--13. No findings of fact appear in the ALJ's opinion as to whether the employer had granted an impermissible economic benefit by re-instating health insurance for the spouse of one employee. Compare ALJ Opinion, I J.A. at 4--24, to Report on Objections, II J.A. at 12--14, 16
 
 
 [2]
 29 U.S.C. § 160(e), (f) (1970) provides in relevant part:
 (e) The Board shall have power to petition any court of appeals of the United States . . . for the enforcement of such order . . .. The findings of the Board with respect to questions of fact if supported by substantial evidence on the reocrd considered as a whole shall be conclusive . . .
 (f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals . . .. (T)he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.
 
 
 [3]
 Three cases had been consolidated in the appeal--Gissel Packing Co., Heck's Inc., and General Steel Products, Inc. In addition, a separate appeal of Sinclair Company was disposed of by the Court in the Gissel opinion. The facts of General Steel are closest to those at issue in this case
 
 
 [4]
 The Supreme Court held in Linden Lumber Co. v. NLRB, 419 U.S. 301, 310, 95 S.Ct. 429, 434, 42 L.Ed.2d 465 (1974), that mere refusal to accept a majority showing is not of itself an unfair labor practice. Sustaining Board policy, the Court ruled that the burden to ask for an election is on the union rather than the employer. The decision, however, clearly indicates that Gissel still controls where 'an employer has engaged in an unfair labor practice that impairs the electoral process' in addition to refusing to accept the showing of majority status. As one commentator has observed about the Linden Lumber decision,
 the Court clarified the Gissel decision, which held that the key to the issuance of a bargaining order is whether the employer has committed an unfair labor practice that interferes with the election process, not whether the union has evidenced majority support.
 Linden Lumber Division v. NLRB: Requisites for Issuance of a Bargaining Order--A Logical Extension of the Gissel Doctrine, 2 Ohio Northern L.Rev. 774, 775 (1975).
 
 
 [5]
 It is unclear from the ALJ's opinion why this April 14 authorization was not sufficient to give the union a majority as of the demand date. Nor is his computation of 48, rather than 52, authorizations as of May 8 clear. I J.A. at 16--19. Despite these facial mathematical inconsistencies, however, the continuing demand theory applied by the ALJ provides a solid basis for imposing the bargaining order. Cf. NLRB v. Mink-Dayton, Inc., 416 F.2d 327 (6th Cir. 1969), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59, enforced after remand, 426 F.2d 255 (6 Cir. 1970)
 
 
 [1]
 29 U.S.C. § 158(a)(5) which provides:
 (a) It shall be an unfair labor practice for an employer--
 (5) to refuse to bargain collectively with the representatves of his employees, subject to the provisions of section 159(a) of this title.