KING RADIO CORPORATION, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent (two cases).

Nos. 9587, 9601.

United States Court of Appeals Tenth Circuit.

July 22, 1968.

---

**16**

William G. Haynes, Topeka, Kan. (Lillard, Eidson, Lewis & Porter, O. B. Eidson, Philip H. Lewis, James W. Porter, Charles S. Fisher, Jr., Charles N. Henson, Peter F. Caldwell, Roscoe E. Long, R. Austin Nothern and Brock R. Snyder, Topeka, Kan., on the briefs) for petitioner.

Robert Lieber, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul B. Spielberg and Harold B. Zanoff, Attys., N. L. R. B., on the briefs) for respondent.

Before PHILLIPS, HILL and HICKEY, Circuit Judges.

PHILLIPS, Circuit Judge.

At all times material in these cases, King Radio Corporation, Inc.,[1] a Kansas corporation, was engaged in the manufacture of aircraft radios and related items in its two plants in Olathe, Kansas, where it annually receives materials and products of a value in excess of $50,000 directly from outside that state, and annually ships goods and products of a value in excess of $50,000 directly to customers outside that state. The jurisdiction of the National Labor Relations Board[2] in these cases is not challenged.

I

*No. 9601*

This case is before the court upon a petition of King to set aside an order of the Board, issued June 30, 1967, and the cross-petition of the Board to enforce such order.

Charges were filed against King by Communications Workers of America, AFL–CIO,[3] on August 31, 1966, and amended on October 5, November 8, and December 6, 1966. A complaint based on those charges was issued on November 30, 1966, and was amended on December 6, 1966.

The Union began its organizational drive in King's two plants on March 7, 1966, and requested recognition on April 12, 1966. A direction of election was issued on June 13, 1966. The election was held in the forenoon of June 30, 1966. The majority of the employees voted for the designation of the Union as the bargaining representative of an appropriate unit. The votes of employees designated as lead ladies were challenged, but regardless of how the persons whose votes were challenged voted, the Union would still have received a majority.

The Regional Director certified the Union as the exclusive bargaining representative of the unit on August 19, 1966.

1. *Interrogation of Employee Hamblin*

On April 28, 1966, William G. Haynes, a lawyer representing King, summoned employee Juanita Hamblin from her work and questioned her in private for over an hour. He did not advise her that she was free not to answer his questions if she did not desire to do so. He asked her why she was unhappy at her work and repeatedly asked her who else was dissatisfied and what they were unhappy about. When she stated there was some dissatisfaction respecting wages, he asked her whether there was anyone in particular who was dissatisfied as to wages.

The Trial Examiner found that Haynes's inquiries constituted subtle, but unmistakable inquiries about the union support of Hamblin and other King employees and put Hamblin under

1. Hereinafter called King.
2. Hereinafter called the Board.
3. Hereinafter called the Union.

pressure to reveal information about union sympathies and activities of King's employees. He concluded the interrogation of Hamblin was coercive and violated § 8(a) (1) of the National Labor Relations Act, as amended [4] (29 U.S.C.A. § 151 et seq.).

## 2. *No-solicitation Rule*

Prior to June 22, 1966, which was eight days before the election, King had not had a no-solicitation rule in its plants and had permitted solicitation in its plants during working hours for many causes, such as the United Fund, showers, flowers, birthday presents, and farewell gifts.

On June 13, 1966, King mailed to its employees nine election campaign letters, one on June 16, one on June 17, two on June 20, one on June 22, and four thereafter.

On June 22, 1966, James R. Harris, vice president of King, after consulting with Haynes, posted in the plant a no-solicitation rule, which read as follows:

"Inasmuch as we have received several complaints from various employees that they have been disturbed during working hours by other employees, we feel that it is necessary to establish the following rule:

"It will be considered a violation of Company Policy and cause for discharge for any employee to discuss politics, religion or engage in any type of solicitation for any cause during working hours in a work area inside the plant."

The Trial Examiner found that King discriminatorily promulgated the no-solicitation rule for the purpose of defeating its employees' organizational efforts, in violation of § 8(a) (1) of the Act.

## 3. *Unilateral Changes*

### (a) *No-Talking Rule and Warning Slips*

On the afternoon of June 30, 1966, King promulgated orally, through its supervisors, a no-talking rule, forbidding employees to talk with each other during working hours. This was a radical change from a previous policy regarding talking among employees during working hours.

On that afternoon, after the election had been completed, assistant production superintendent Roberta Johnson advised production supervisor Martha Walker that "from this moment on" there was to be no talking and she meant absolutely no talking, and that the order came from production superintendent Robert Honn, whereupon Walker advised all of the employees on her production line of the provisions of the new rule. Thus, it will be seen that the new no-talking rule was promulgated after the election had been completed and the result of the voting made known.

■ Since the Union received a majority of the votes at the election, King, although it filed objections to the election, acted at its peril in unilaterally changing working conditions before the certification.[5]

On July 18, 1966, King introduced a policy of issuing warning slips for violation of the no-talking rule.

The Trial Examiner found that King acted in bad faith, for discriminatory purposes and in violation of § 8(a) (1) and (5) of the Act, in making changes in working conditions by adopting the no-talking rule on June 30, 1966, and instituting on July 18, 1966, the policy of giving warning slips for violations of such rule, without notifying the Union and giving it an opportunity to bargain about the changes.

4. Hereinafter called the Act.

5. NLRB v. Laney & Duke Storage Warehouse Co., 5 Cir., 369 F.2d 859, 869;

NLRB v. Zelrich Company, 5 Cir., 344 F.2d 1011, 1015;
Cf. NLRB v. Katz, 369 U.S. 736, 742–743, 82 S.Ct. 1107, 8 L.Ed.2d 230.

(b) *Deductions for Savings Bonds*

One of King's employee benefits at the time of the election was its practice of making payroll deductions for savings bonds upon request. Several months before the election, Carroll J. Weltsch, the financial vice president of King, recommended that the practice of deductions for savings bonds be discontinued. Both Harris and production superintendent Bible dissented, stating, "it is a nice thing. We started with it, why not continue with it."

On the afternoon of June 30, 1966, immediately after the election, but without notice to the Union, King posted a notice dated June 30, 1966, stating, "Effective with the close of business today, the Company will no longer make payroll deductions for U. S. Savings Bonds."

The Trial Examiner found that the discontinuance of the deductions constituted a unilateral change in working conditions and an obvious reprisal and interfered with the § 7 rights of the bargaining unit employees.

(c) *New Retirement Policy*

At the time of the election on June 30, 1966, King had on its payroll an employee, Helen West, who had reached her 65th birthday on or before January 1, 1966. The only written policy which King had on retirement at that time was stated in its profit sharing plan, in a section concerning withdrawals on "Disability, Death Or Retirement." It read:

"Normal Retirement Date is the last day of the plan year in which male Participants have reached age 65, and female Participants have reached age 60.

"An optional Retirement Date may be established as *some date prior to the Normal Retirement Date* but subject to a written consent between the Administrative Committee and the Participants involved." (Emphasis supplied.)

At the time that plan went into effect on January 1, 1963, West was 62 years of age (two years older than the normal retirement age for women) yet she was allowed to participate in the plan. In fact, none of King's employees had been retired before the election. However, on July 22, 1966, four days after the employees returned from a vacation shutdown, King, without conferring with the Union, posted a notice entitled "Retirement," which read:

"It is the policy of the Company, that when an employee attains the age of 65, they shall retire from King Radio Corporation, Inc. However, employees that have reached 65 years of age, may be retained by the Company on a month to month basis, but in no case shall a full time employee be retained past the age of 70.

"All Fringe Benefits will be discontinued at the age of 65."

No action was taken under the new retirement notice with respect to West until August 10, 1966, when Mrs. Bible told West that September 1, 1966, would be her last day. Prior thereto, nothing had been said to her about retiring or losing any of her fringe benefits or seniority rights. Thereupon, West talked with Harris about her retirement. He told her that on September 1 she would be taken out of the profit sharing plan and that all her insurance and other benefits would cease, but that she could stay on until she was 70 on a month to month basis. When she asked Harris what the effect would be on her seniority rights, he told her that she would lose those rights also. West was constructively retired by King on September 2, 1966.

The Trial Examiner found that King unilaterally established the retirement policy after the election and retired West pursuant to that policy, after threatening her with the loss of her seniority, insurance, and other fringe benefits, and concluded that by making those changes in working conditions without consulting with the Union, King violated § 8(a) (1) and (5) of the Act.

(d) *Changed Payday for Plant Clericals*

There were eight plant clerical employees included in the bargaining unit.

After the election, King stopped paying them weekly, as all bargaining units were paid, and began paying the clerical employees bi-weekly. Although King and the Union were at that time carrying on bargaining negotiations, King did not consult the Union with respect to the change in the paydays of the clerical employees.

The Trial Examiner found that such change was a unilateral one, which violated § 8(a) (1) and (5) of the Act.

(e) *Suspension and Discharge of Union Supporters*

(1) Prior to June 30, 1966, vice president Harris had never personally discharged any of the employees who assembled radios on the production lines or directed the discharge of such an employee. The hiring and discharging of the employees on the assembly lines at both plants were the responsibility of production superintendent Bible. However, on July 20, 1966, Harris instructed Bible to discharge a production employee, Marie Thomas, who had openly supported the Union. King contended that the reason for the discharge was excessive absenteeism. The Trial Examiner found, however, that that reason was a mere pretext and that the discharge was a part of King's post-election "crack-down" on its employees and was in reprisal for their Union activities and support, and for the purpose of undermining the Union. He concluded that the discharge of Thomas was discriminatory and in violation of § 8(a) (3) and (1) of the Act.

(2) On July 19, 1966, King gave Doris Owens, a supporter of the Union, a written warning for violating the no-talking rule. On July 29, 1966, it gave her a second warning for violating the no-talking rule, and Bible discharged her later on that day. The Trial Examiner found that the discharge of Owens was for union activity and not for the reasons given by King, and concluded that King discriminatorily discharged her in violation of § 8(a) (3) and (1) of the Act.

(3) On September 1, 1966, King discharged Vivian Waite, a clerk-typist for the quality control department, on the ground of absenteeism. Waite was injured in an automobile accident on August 10, 1966, and was hospitalized until August 15, 1966. She telephoned Honn on August 29, 1966, and told him she was still taking therapy treatments. He advised her that he would put her on a 30-day leave. Previously, he had advised her "he would keep" her "job open for" her.

The Trial Examiner found that the reason given by King for the discharge of Waite was a pretense, and that the real reason was her union activity. He concluded that King discriminatorily discharged Waite in violation of § 8(a) (3) and (1) of the Act.

(4) On September 6, 1966, Honn approved the termination of the employment of Florence Theis by King on the ground that she did not return to work after the expiration of a leave granted her. Theis testified that she was granted a leave of 30 days from August 22, 1966.

The Trial Examiner found that the reason given by King for the discharge of Theis was a mere pretext, and that she was discharged for union activity. He concluded that her discharge was discriminatory and in violation of § 8(a) (3) and (1) of the Act.

(5) On October 12, 1966, King suspended production line employee Pat Bennett and production supervisor Betty Like for soliciting union membership in violation of the no-solicitation rule. On October 18, 1966, King placed Bennett on a two-week disciplinary suspension and discharged Like for misconduct. Bennett did not return to work after such suspension.

The Trial Examiner found that Bennett's suspension was discriminatorily motivated to discourage membership in the Union and concluded it violated § 8 (a) (3) and (1) of the Act.

The Trial Examiner found that the discharge of Like as a supervisor did not tend to interfere with the employees' legitimate union activities, and that her

discharge did not violate § 8(a) (3) and (1) of the Act.

(f) *Delay in Bargaining*

At the election held on June 30, 1966, the vote, on the basis of the unchallenged ballots, was 182 in favor of designating the Union as the bargaining agent for the unit to 114 against. King filed objections, which the Regional Director overruled, and certified the Union on August 19, 1966, as the bargaining agent of the unit. Thereafter, King filed a request for review by the Board, which the Board denied on September 21, 1966. King then recognized the Union as the certified bargaining representative of the employees in the unit and entered into negotiations with the Union.

On August 4 and on August 30, 1966, the Union wrote King letters, seeking grievance meetings to discuss the alleged discriminatory discharge of employees Owens and Thomas. On August 25, 1966, the Union made a written request for certain payroll and other information to prepare for negotiations. King answered the requests for grievance meetings by writing that the Union's letters had been forwarded to King's counsel, Haynes, and ignored the request for bargaining information until September 23, 1966, when Haynes answered, "I now have authority to meet with you." Negotiations began on October 4, 1966, and King thereafter furnished the Union information on eight of the 11 items requested in its letter of August 25, 1966, and promised to furnish additional information on the other items when compiled.

King asserted that it was not obligated to bargain with the Union until the Board ruled on its request for review of the Regional Director's ruling on the validity of the election.

The Trial Examiner summarized his findings, in part, as follows:

■ Immediately after the election on the afternoon of June 30, 1966, Haynes met with King's executives and began making unilateral changes in working conditions. On the afternoon of June 30, 1966, King cancelled its program of making payroll deductions for savings bonds and promulgated a new, discriminatorily motivated no-talking rule. Thereafter, it adopted various pretexts for discriminatorily discharging union supporters, and gave no response to the Union's repeated requests for grievance meetings to discuss these alleged discriminatory actions. It announced a new retirement policy and stripped an employee of her seniority and fringe benefits, thereby inducing her, in the absence of union representation, to accept retirement. It ignored the fact that eight plant clerical employees were a part of the bargaining unit, and changed their paydays from the weekly basis for unit employees to a bi-weekly basis for excluded employees. Early in September 1966, King mailed a notice to its employees predicting that "it may be a matter of several months before we receive word from the N.L.R.B. on the Company's request for review," and stating it was not legally obligated to negotiate in the meantime. He concluded King had acted in bad faith to undermine the Union by refusing to bargain respecting discharges and to furnish requested information.

On the record considered as a whole, it is our opinion that the evidence and the facts reasonably inferable therefrom afforded substantial support for the Trial Examiner's findings of fact adopted by the Board, and we feel no useful purpose would be served by reciting the evidence in detail.

■ When an employer honors a certification and recognizes and begins bargaining with the certified representative, it waives a contention that the election and certification are invalid.[6]

■■ An employer may secure a review of the validity of an election and the certification of a bargaining agent by declining to bargain and raise the issue when the Board seeks enforcement

6. NLRB v. Blades Manufacturing Corporation, 8 Cir., 314 F.2d 998, 1005.

of its order.[7] By not following that course, King waived its objection to the election by bargaining with the Union upon the issuance of the certification and thereafter.

We conclude that there was no error, either in the proceedings before the Trial Examiner or the Board. Accordingly, the Board's order will be enforced.

## II

## No. 9587

This case is before the court on the petition of King to review and set aside an order of the National Labor Relations Board and the cross-petition of the Board to enforce its order.

At various dates between December 19, 1966, and January 18, 1967, a hearing was had before a Trial Examiner on the complaint filed in No. 9061, which alleged violations of § 8(a) (1), (3) and (5) of the Act.

Production Supervisors Marlene Jones, Martha Walker and Naomi Cesar were subpoenaed by the General Counsel to appear at such hearing. They appeared on December 19, 1966.

On December 22, 1966, Jones and Walker testified as witnesses for the General Counsel. Each gave testimony which supported the allegations of the complaint and was adverse to King. Cesar was present at the hearing, but was not called to testify.

On January 19, 1967, Harris, vice president of King, discharged Jones and placed Walker and Cesar on probation. Later, Cesar was constructively discharged.

The Trial Examiner found that Harris, as vice president of King, discharged Jones and placed Walker on probation in reprisal because they gave testimony adverse to King at such hearing; that King placed Cesar on probation because of her willingness to testify as a witness for the General Counsel at such hearing; that King thereafter, by continued surveillance and harassment forced Cesar to quit her job on June 30, 1967, and that

in fact she was constructively discharged on that date.

The Trial Examiner concluded that King, by discharging Jones, because she gave testimony adverse to it in No. 9601, and placing Walker on probation, because she gave testimony adverse to King in No. 9601, and placing Cesar on probation and constructively discharging her, because she was willing to testify as a witness for the General Counsel in No. 9601, violated § 8(a) (1) of the Act.

The Trial Examiner, on the basis of his findings, recommended an appropriate order.

Exceptions to the Trial Examiner's rulings, findings, conclusions, and recommendations were filed with a supporting brief by King. The Board rejected them on the entire record, and adopted the findings, conclusions, and recommendations of the Trial Examiner.

We have carefully examined the entire record and are of the opinion that the findings of the Trial Examiner adopted by the Board are supported by substantial evidence on the record considered as a whole (29 U.S.C.A. § 160(f)). We think no useful purpose would be served in setting forth the evidence in detail.

■ Did the action of King in discharging Jones and placing Walker on probation, because they appeared and testified adversely to King at the hearing in No. 9601, and placing Cesar on probation, because she appeared at the hearing and was willing to testify to facts adverse to King, violate § 8(a) (1) of the Act?

■■ To constitute such a violation, such conduct must have violated the rights of King's employees, other than supervisors, since a supervisor is not "an employee," as that term is defined in 29 U.S.C.A. § 152(3), and § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1), applies only to employees.

Section 8(a) (1) of the Act reads:

"(a) It shall be an unfair labor practice for an employer—

---

7. Boire v. Greyhound Corp., 376 U.S. 473, 477, 84 S.Ct. 894, 11 L.Ed.2d 849; NLRB v. Clearfield Cheese Company, 3 Cir., 322 F.2d 89, 92.

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \* "

■ The language of § 7 of the Act warrants the implication that it includes the right to the remedies provided by the Act for the enforcement of the rights specifically guaranteed by that section. Were it otherwise, the Congressionally declared purposes of the Act would be frustrated.

An important part of such remedies is the right to have supervisors who have knowledge of pertinent facts appear and testify in a Board proceeding, without such supervisors risking retaliatory action on the part of their employer if their testimony is adverse to it.[8]

As an additional basis for concluding that King's retaliatory action against Jones, Walker and Cesar violated § 8(a) (1) of the Act, the Board found that the unfair labor practices found by it to have been committed by King in No. 9601—the record of which was included in No. 9587 by reference—including the discriminatory discharge of four employees, which closely preceded the events in No. 9587, "tended to cause bargaining unit employees to fear" that the retaliatory action by King against Jones, Walker and Cesar was merely a continuation of King's anti-union campaign and would cause such employees to fear that their rights under § 157 were in jeopardy. Hence, the retaliatory action taken by King against Jones, Walker and Cesar in the instant case would, in effect, restrain

and coerce employees in the exercise of their rights under § 7 of the Act and bring the instant case within the ambit of § 8(a) (1).[9]

The contention that the bargaining unit employees did not know that Jones and Walker testified as witnesses for the General Counsel at the hearing in No. 9601, and that Cesar appeared at such hearing and was willing to testify, nor that those acts caused the retaliatory action by King, is refuted by the record in No. 9601. The hearing in that case involved matters of great importance to the employees, particularly the fate of the four discharged union adherents and the future of King's bargaining relationship with the union they had selected as their agent. At such hearing, 10 employees testified for the General Counsel, and the Union representatives were present throughout such hearing. Under these circumstances, it is inconceivable that the bargaining employees were unaware that Jones and Walker appeared and testified and Cesar appeared and was willing to testify, and that immediately after the hearing closed they were discharged. Attuned to these facts, and well aware of King's union attitude as disclosed by the facts established in No. 9601, employees would readily discern the pattern of retaliation and perceive in the treatment of the supervisors a reliable indication of what would befall them if they persisted in their union activities.[10]

We agree that the finding of the Board, upon which it based its additional ground for concluding the retaliatory action against Jones, Walker and Cesar resulted in a violation of the employees'

---

8. Local No. 207, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 707, 83 S.Ct. 1429, 10 L.Ed.2d 646; Oil City Brass Works v. NLRB, 5 Cir., 357 F.2d 466, 471, 472.

9. Local No. 207, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko, supra; See NLRB v. Dal-Tex Optical Company, 5 Cir., 310 F.2d 58, 62; See also, NLRB v. Talladega Cotton Factory, 5 Cir., 213 F.2d

209, where the court held that an employer violated § 8(a) (1) by discharging a supervisor, because he refused to commit unfair labor practices.

10. NLRB v. McBride Construction Company, 10 Cir., 274 F.2d 124, 127; Cf. NLRB v. Local 140, United Furniture Workers of America, CIO, 2 Cir., 233 F.2d 539, 540, 541; United Mine Workers of America v. Osborne Mining Co., 6 Cir., 279 F.2d 716, 725, cert. denied 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103.

rights guaranteed by § 7 of the Act, afforded additional ground for such conclusion.

Accordingly, the order of the Board will be enforced.