**PEABODY COAL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 82-1220, 82-1857 and 82-1980.

United States Court of Appeals,
Sixth Circuit.

Argued July 27, 1983.

Decided Jan. 13, 1984.

Rehearing Denied Feb. 10, 1984.

358

Harold I. Elbert (argued), Charles S. Elbert, Patrick M. Sanders, St. Louis, Mo., Paul C. Sunderland, Cincinnati, Ohio, Barbara A. Gumbel, Edwardsville, Ill., John Cox, Benton, Ill., for Peabody Coal Co.

Elliott Moore, Edward Dorsey, Deputy Associate General Counsel (argued), John C. Truesdale, Washington, D.C., for N.L.R.B.

Before KENNEDY and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.

**360**

BOYCE F. MARTIN, Jr., Circuit Judge.

The Peabody Coal Company seeks review of, and the National Labor Relations Board cross-applies for enforcement of, the Board's February 4, 1982 and October 12, 1982 orders, 259 N.L.R.B. 183 and 265 N.L.R.B. 13, respectively, finding Peabody in violation of sections 8(a)(5), (3) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 158(a)(5), (3) and (1). We grant enforcement in part, deny enforcement in part, and remand for further proceedings consistent with this opinion.

The representation election among the warehouse clerks.

Peabody, operator of the Will Scarlet Surface Mine, an open, above-ground coal mine in Stovefort, Illinois, was a signatory with the United Mine Workers to the National Bituminous Coal Wage Agreement of 1978. The Agreement, a collective bargaining contract negotiated by the Bituminous Coal Owners' Association and the United Mine Workers, was signed by the Company and other coal mine owners on an individual basis. The Agreement purported to cover all employees at the mine except those specifically excepted. Article 1A, Section (b), the exemptions clause, provided:

It is the intention of this Agreement to reserve to the Employers and except from this Agreement an adequate force of supervisory employees to effectively conduct the safe and efficient operation of the mines and at the same time, to provide against the abuse of such exemptions by excepting more such employees than are reasonably required for that purpose.

Coal inspectors and weigh bosses at mines where men are paid by the ton, watchmen, *clerks,* engineering and technical forces of the Employer, working at or from a district or local mine office, *are exempt from this Agreement.*

All other Employees *working in or about the mine shall be included in this Agreement except essential mine foremen who, in the usual performance of their duties, may make examinations for gas as prescribed by law, and such other*

supervisors as are in charge of any class of labor inside or outside of the mines and who perform no production work.

The Union will not seek to organize or ask recognition for such excepted supervisory employees during the life of this contract.

(emphasis added). Section (a) of the same article, the work jurisdiction clause, provided:

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal (except by waterway or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of job piles and mine roads, and work customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of the Article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

In November, 1980, the United Mine Workers petitioned the Board for a representation election among the company's eight warehouse clerks. At a December 1 hearing, the parties stipulated that the eight employees comprised an appropriate bargaining unit. The company, however, opposed an election on the grounds that the language of sections (a) and (b) of Article 1A of the Agreement barred the union from representing or organizing the clerks. Specifically, it asserted that in agreeing to exempt warehouse clerks from the Agreement's coverage, the union was implicitly promising not to seek recognition from or to attempt the organization of those employees.

The Board's regional director disagreed. In a decision issued December 12, 1980, he ordered an election. On January 9, 1981,

following the Board's denial of the company's request for review, the union was elected exclusive bargaining representative for the warehouse clerks. Certification came on January 19 and ten days later, the union made its first bargaining request. The company refused to bargain, taking the position unsuccessfully asserted at the earlier hearing that, by the terms of the Agreement, the union was without jurisdiction over the clerks. The union responded by filing unfair labor practice charges, alleging violations of sections 8(a)(5) [1] and (1) [2].

While the jurisdictional dispute was developing, the company and a number of its warehouse clerks were involved in a series of incidents which led to separate 8(a)(1) charges. The Board found that on December 12, 1980, Peabody's mine superintendent, Ron Menzie, told warehouse clerk Danny Gibbs that a union victory would jeopardize employee seniority and that if the possibility of a shut down in part of the mine came about, those warehouse clerks with low seniority could lose their jobs to the miners. Menzie had essentially the same conversation with Don Richardson, also a clerk, on December 21. After warning of the possible consequences of unionization, however, he went on to inquire whether Richardson had signed a union authorization card and to ask what it was that Richardson expected to gain from union membership. On January 7, 1981, Lori Wahls, a clerk, was told by Menzie that she would "probably never work at Peabody again" if, as he predicted, a union election led to her layoff.

Following the election, Menzie asked clerk Don Emmons whether Emmons had voted for "me" or "them." In a January 23, 1981 conversation with clerk Phyllis Elder, Menzie expressed his surprise that the clerks had elected the union. He, Menzie said, had been good to the clerks. He concluded by saying that he would lay off all the clerks, eliminate much of the paperwork, and have the remainder done by the miners or Peabody's St. Louis office. On February 15, Menzie spoke again with Gibbs. "You've lost your jobs to the union now," said Menzie. He would hire fourteen new employees, he said, putting the warehouse clerks "further down the line in . . . seniority." Eight days later, Menzie called Gibbs and Elder into his office and, prefacing his remarks with the comment that several employees had asked how to resign from the union, told them that they could use a company typewriter to prepare an affidavit requesting that bargaining cease. He warned that unless five or more employees signed the affidavit, it would be impossible for them to get a company job outside the bargaining unit. Menzie then specifically identified George Brouillette, the lone vote against the union, as the only clerk eligible for a job outside the bargaining unit. He finished by stating that when negotiations with the union began, the clerks would get only what the company wished to give them.

In late February, Richardson, Brouillette, and Jerry Robinson were contacted by Menzie and told that they could resign from the union by individually or collectively informing the union by letter. Similar instructions were offered to Emmons. In the last of these incidents, Menzie approached Wahls on March 2 and volunteered the information that three or four clerks had approached him seeking instructions as to how to withdraw from the union. Wahls, he suggested, could type an affidavit to that effect using a company typewriter.

---

1. Section 8(a)(5), 29 U.S.C. § 158(a)(5) provides in pertinent part as follows:

 (a) It shall be an unfair labor practice for an employer—

 . . . .

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this statute.

2. Section 8(a)(1), 29 U.S.C. § 158(a)(1) provides as follows:

 (a) It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 . . . .

Following a hearing on May 14, 1981, the administrative law judge found Peabody guilty of violating both sections 8(a)(5) and (1). He ordered the company to cease and desist from such practices, to bargain with the UMW for one full year after the date bargaining began, and to post the usual notice. The decision of the judge was adopted by the Board with minor changes on February 4, 1982. 259 N.L.R.B. 183.

We deal first with the company's contention that the United Mine Workers were improperly certified as bargaining representative for the warehouse clerks and that, therefore, the company was under no obligation to bargain. The company's claim turns, in essence, upon the significance it accords the exemption clause in the Agreement. Article 1A, section (b), *supra*. It asks this court to read the exemption of the clerks from the Agreement's coverage as an implicit promise by the union not to assert jurisdiction. This same argument was recently made by Peabody before the Ninth Circuit. The company lost. *Peabody Coal Co. v. NLRB*, 709 F.2d 567 (9th Cir.1983). It fares no better here.

 It is well settled that a union will not be found to have relinquished its jurisdiction over a particular class of employees absent an express promise on its part not to seek to represent or to organize that class.

[O]nly where the contract itself contains an *express* promise on the part of the union to refrain from seeking representation of the employees in question or to refrain from accepting them into membership [will the Board deny certification]; such a promise will not be implied from a mere unit exclusion, nor will the rule be applied on the basis of an alleged understanding of the parties during contract negotiations.

*Cessna Aircraft Co.*, 123 N.L.R.B. 855, 857 (1959). *See also Briggs Indiana Corp.*, 63 N.L.R.B. 1270, 1271–73 (1945). Here, the Board effectively concluded that the Agreement's exemption was a "mere unit exclusion," *id.*, and not an express promise to refrain from representation. That interpretation has "a reasonable basis in the

contract terms, the Act's policies, and the Board's expertise" and is, therefore, entitled to our deference. *NLRB v. C.K. Smith & Co.*, 569 F.2d 162, 168 (1st Cir.1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978).

 The language of the Agreement is plain and unambiguous. "Clerks" and other listed employees, it provides, "are exempt from *this Agreement*. All other employees . . . shall be included" except supervisory personnel. Article 1A, section (b) (emphasis added). That the parties intended to exclude the clerks from coverage only and not jurisdiction is underscored by the fact that when the union did agree to relinquish jurisdiction, the Agreement specifically said so. "The Union will not seek to organize or ask recognition for such excepted supervisory employees during the life of this contract." *Id.* If there were ever any doubts as to whether "supervising employees" was meant to refer to clerks, the parties' stipulation to the contrary puts those doubts to rest. In the circumstances, we can only conclude that the union was properly certified and that the company's refusal to bargain violated section 8(a)(5).

 The Board also found Peabody guilty of repeated violations of 8(a)(1) for, among other things, threatening employees with the loss of seniority and layoff in the event of a union victory, soliciting employee withdrawal from the union, interrogating employees about union activity, and threatening not to bargain in good faith. The Board's findings are summarized above. There is substantial evidence on the record considered as a whole to support the Board's findings. *See Universal Camera Corp v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Mt. Vernon Telephone Corp.*, 352 F.2d 977, 980 (6th Cir.1965); *NLRB v. Magnetics International, Inc.*, 699 F.2d 806 (6th Cir.1983).

 Peabody contends that Menzie's statements to various employees on the effects of unionization were noncoercive

statements of opinion protected by 8(c).[3] For example, it points to Gibb's testimony that Menzie's December 21 remarks to him were prefaced with the declaration that his predictions were merely his opinion.[4] However, Menzie cannot obtain the protection of section 8(c) simply by labeling his statements "opinion." If, despite the employer's bold disclaimer, "their [the employer's statements] reasonable tendency is coercive in effect," they violate 8(a)(1). *Henry I. Siegel Co. v. NLRB,* 417 F.2d 1206, 1214 (6th Cir.1969). *See also NLRB v. Mink-Dayton, Inc.,* 416 F.2d 327 (6th Cir.1969). Whether or not a statement or series of statements has a coercive or threatening effect is an assessment which must be made "in the context of its labor relation setting," taking into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissell Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969), *quoted in Mink-Dayton,* 416 F.2d at 329. Even if Menzie's version of the facts is accepted, he made repeated statements of "opinion" to a relatively small circle of employees which, coming from a company official and in the heat of an organization drive, could easily and understandably be perceived as veiled threats of retaliation. In the circumstances, we think the statements' reasonable tendency was coercive in effect. *Siegel,* 417 F.2d at 1214. We add that the company offered no factual basis for Menzie's prediction as to the union's effect on clerk seniority or the imminency of a layoff. The employer may make

> a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the

prediction must be carefully phrased *on the basis of objective fact* to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. *See Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 263, 274, n. 20, 13 L.Ed.2d 827, 836, 85 S.Ct. 994 [1001, n. 20] (1965). If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Gissell,* 395 U.S. at 618, 89 S.Ct. at 1942 (emphasis added). In *NLRB v. Price's Pic-Pac Supermarkets, Inc.,* 707 F.2d 236, 240 (6th Cir.1983), the court held that company predictions of plant closure in the event of a union victory were not factual predictions but rather threats of volitional economic reprisal where the company produced no financial records to support its predictions and where those predictions were made even before the first union demands were received. The same lack of factual underpinning exists here.

To the Board's conclusion that Peabody violated 8(a)(1) by soliciting the warehouse clerks to withdraw from the union, the company responds, in essence, that the Board credited the wrong witnesses. If the proper evidentiary conclusions had been drawn, the company argues, the Board would have found that in explaining the withdrawal process to various employees, Menzie had been responding to requests for information and not soliciting anti-union activity.

---

**3.** Section 8(c), 29 U.S.C. § 158(c), provides in pertinent part, as follows:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression

contains no threat of reprisal or force or promise of benefit.

**4.** Although Peabody claims Gibbs "understood" Menzie's remarks to be merely opinion, Gibbs' testimony indicates only that he heard Menzie say it was his opinion. Gibbs nowhere states that he accepted it as such.

Credibility determinations are for the administrative law judge or the Board. *NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1029 n. 5 (6th Cir.1974); *Magnetics International*, 699 F.2d at 813. While those determinations need not be given "conclusive" weight, *NLRB v. Mt. Vernon Telephone Corp.*, 352 F.2d 977, 979 (6th Cir. 1965), neither should they be lightly disturbed. Despite conflicts between the testimony of certain witnesses, there is substantial evidence in the record that Menzie voluntarily and gratuitously offered both the method and the means to withdraw from the union. These "solicitations," made to some of the same persons to whom Menzie's "predictions" of layoff and loss of seniority were directed, violated 8(a)(1). *See NLRB v. Allen's I.G.A. Foodliner*, 651 F.2d 438, 440 (6th Cir.1981).

The company also contends that what the Board found to be impermissible interrogation of employees in violation of 8(a)(1) was actually jocular and casual conversation. In *NLRB v. Armstrong Circuit, Inc.*, 462 F.2d 355, 357 (6th Cir.1972), we reiterated that to determine whether employer interrogation of employees is unlawful, it must be determined "whether it may reasonably be said that the interrogation 'tends to interfere with the free exercise of employee rights under the Act.'" (quoting *Hughes & Hatcher, Inc. v. NLRB*, 393 F.2d 557, 563 (6th Cir.1968)). *See also Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 819 (6th Cir.1975). Given Menzie's position in the company, the fact that his inquiries of Richardson were accompanied by predictions as to the consequences of union victory, and the fact that the questions called for a tacit admission of union sympathy, we think the probable effect of the interrogatories was to inhibit union activity. *Larand Leisurelies*, 523 F.2d at 819.

Peabody also takes issue with the finding that Menzie's comment concerning negotiations—that the employees would not get what they wanted but, rather, only what the company wished to give them— was an unfair labor practice. The administrative law judge noted the possible uncertainty as to whether the comment was merely a projection of the company's bargaining stance or an implication of the futility of negotiations. He concluded, however, that in the context in which the remark was made, "especially [Menzie's] urging employees to disavow the union," the remark was unlawful. We agree.

Accordingly, we enforce this part of the Board's order covered by the decision in 259 N.L.R.B. 183.

*Wage and benefit increases during review of the representation issue.*

In April, August, and December, 1981, while awaiting a hearing before this court on the 8(a)(5) and (1) violations discussed above, and without notifying or consulting with the union, Peabody gave three separate wage or benefit increases to all of its warehouse clerks except those clerks employed at the Will Scarlet mine. In April Peabody raised overtime and holiday pay rates; in August it instituted a fully funded dental and vision care benefit program; and in December, it gave merit pay increases retroactive to October 1. These actions were the subject of a separate proceeding before the Board, the result of which was a decision that the company violated sections 8(a)(5) and (3) when it withheld from the Will Scarlet warehouse clerks benefits accorded other clerks without first bargaining with the union. The Board issued a cease and desist order requiring the company to grant the Will Scarlet clerks withheld wage and benefit increases retroactive to the date the increases were extended to other clerks, to make whole the clerks for losses incurred as a result of the withholding of wages and benefits, to bargain with the union over any future changes in terms and conditions of employment, and to post a broadly prospective notice to employees declaring, among other things, that the company would not, "in any other manner interfere with, restrain, or coerce our employees in the exercise of their rights guaranteed them by Section 7 of the Act."

We consider first the 8(a)(5) refusal to bargain charge. The Board contends that the exclusion of the Will Scarlet clerks from

the increases was a change in the terms and conditions of employment over which the company had the duty to bargain. The company responds that, because there was no evidence that the increases were so customary as to become "terms and conditions of employment," it had no obligation to bargain over their implementation. Moreover, argues the company, because it was engaged in a challenge to certification, to have capitulated and bargained with the union, even for the limited purpose at issue here, would have jeopardized its certification challenge.

An employer violates section 8(a)(5), when, although subject to a duty to bargain, it makes unilateral changes in existing terms and conditions of employment without first notifying the collective bargaining agent. *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *NLRB v. Allied Products Co.,* 548 F.2d 644, 652 (6th Cir.1977); *NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 98 (5th Cir.1970), *NLRB v. United Aircraft Corp.,* 490 F.2d 1105, 1109 (2d Cir.1973). "The Act is violated by a unilateral *change* in the *existing* wage structure whether that change be an increase or the denial of a scheduled increase." *Allied Products,* 548 F.2d at 653 (emphasis added). In this case, the administrative law judge found "no evidence whatsoever" of an established practice on Peabody's part of granting at regular intervals the type of wage and benefit increases at issue here. *Cf. Sweetwater Hospital Assoc.,* 226 N.L.R.B. 321, 324 (1976) (withholding wage increases violates 8(a)(5) when employer had an "*established* practice" of annual wage adjustment). Absent evidence of an established practice, there are no grounds for finding that Peabody unilaterally changed that practice by not raising the wage and benefit levels of its Will Scarlet clerks. Peabody correctly asserts that its inaction as to these clerks properly maintained the status quo.

The Board argues by way of rebuttal that had the Will Scarlet clerks not elected the union, thereby engendering the conflicts at issue here, they would have been included in the April, August, and December increases. To exclude the clerks, therefore, constituted a change in terms and conditions of employment. This argument, while perhaps persuasive in the context of an 8(a)(3) discrimination charge, proves too much in the 8(a)(5) context. The Board's contention, if accepted, places the company in such a position that any action on its part is illegal. In the circumstances of this case, where the administrative law judge determined that the wage and benefit increases were not part of the terms and conditions of employment, to have extended those increases to the Will Scarlet clerks without bargaining would unquestionably have generated an 8(a)(5) charge. *See Allied Products,* 548 F.2d at 652. The Board would have us hold, however, that to withhold such increases would be equally unlawful. This result is untenable. It effectively prevents every employer engaged in a certification challenge at one plant from negotiating with employees at its non-union plants pending the outcome of the certification battle.

In response the Board argues that an employer caught in this dilemma has a simple solution—consult with the union before acting. When, however, an employer is engaged, as this employer is, in a technical 8(a)(5) violation—the only means by which it may obtain judicial review of union certification, *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 151, 61 S.Ct. 908, 911, 85 L.Ed. 1251 (1941); *NLRB v. Blades Manufacturing Corp.,* 344 F.2d 998, 1002 (8th Cir.1965)—its recognition of the union for purposes of consultation is, at best, inconsistent with its opposition to certification. That inconsistency could jeopardize its chances of success in future litigation. *Blades Manufacturing,* 344 F.2d at 1005. At worst, recognition of the union prior to disposition of the certification proceedings, even "limited recognition" of the sort the Board envisages here, may be taken as a waiver of objections to union representation. *King Radio Corp. v. NLRB,* 398 F.2d 14, 20 (10th Cir.1968). There is no legal basis to force such a choice. When an employer sedulously avoids changing pre-certi-

fication work conditions for a bargaining unit during the pendency of a certification challenge, it does not violate section 8(a)(5), even if it declines to abstain from such activity among its independent employees.[5]

 The same activity that we have held cannot be the basis of an 8(a)(5) charge may, however, violate 8(a)(3). An employer violates 8(a)(3) when it discriminates between unionized and non-unionized employees "to encourage or discourage" union membership. *See NLRB v. Cement Transport, Inc.,* 490 F.2d 1024, 1028 (6th Cir. 1974); *Eastern Maine Medical Center v. NLRB,* 658 F.2d 1, 7 (1st Cir.1981). The Board bears the burden of proving disparate treatment by the employer is motivated by anti-union animus. *Russell-Newman Manufacturing Co. v. NLRB,* 406 F.2d 1280, 1282 (5th Cir.1969); *Cement Transport,* 490 F.2d at 1028. Circumstantial evidence of motivation can be sufficient. *Russell-Newman.*

Here, although the absence of evidence that the wage and benefit increases were part of the terms and conditions of employment precluded the Board's reliance on a *per se* violation at 8(a)(3), direct and circumstantial evidence of outright opposition to the union both before and after the increases supported the 8(a)(3) charge. Specifically, Menzie's statements during the post-election, pre-certification period, statements that we have affirmed are violations of 8(a)(1), are proof of the company's hostility to the union. Also relied upon by the administrative law judge was Menzie's statement to Emmons in June that "this [the company-wide increases] doesn't pertain to you guys [the Will Scarlet Mine

warehouse clerks] because you're trying to get into the union." Although the administrative law judge did not hold the statement itself a separate 8(a)(1) violation because the Board had not raised such a challenge, he considered it as "direct and cogent evidence of union hostility." Finally, he pointed to the employer's "consistent and unwavering" challenge to the union's representative status.

 Although "[t]he Board, not the courts, has the delicate task of divining an employer's motives," *NLRB v. Lou de Young's Market Basket, Inc.,* 406 F.2d 17, 21 (6th Cir.), *remanded on other grounds,* 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969), *quoted in Cement Transport,* 490 F.2d at 1028, the Board's determination is nevertheless subject to our review for substantial evidence. *Cement Transport,* 490 F.2d at 1028. Substantial evidence in such circumstances is "such evidence as a reasonable person might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). Bearing in mind that credibility determinations are for the Board, *Cement Transport,* 490 F.2d at 1029 n. 5, we find sufficient evidence in the record as a whole to support the Board's findings of discriminatory intent. Our determination, however, rests solely on the company's posture as manifested by Menzie's behavior over the relevant period. We note that it was error for the administrative law judge to consider the fact that the company remained steadfast and consistent in opposition to the certification as evidence of company prejudice. It may be true that a company that engages in a technical

---

**5.** This is not a situation similar to that before the Second Circuit in *United Aircraft Co. v. NLRB,* 490 F.2d 1105 (1973). There the court enforced an 8(a)(5) charge where the employer, in order to preserve its bargaining position relative to a newly elected union, withheld from its newly organized employees a scheduled wage increase. One among several defenses raised by the employer was the contention that the difficulty in ascertaining whether the wage increase was an existing term of employment placed it in a dilemma—either granting or withholding the wage hike might constitute an un-

fair labor practice. The court dismissed the argument, declaring that the company could have avoided all risk by notifying or consulting with the union beforehand.

There are two significant differences between *United Aircraft* and this case. First, in *United Aircraft,* the employer did not challenge the union's right to represent the unit in question. Second, the court found that the wage increase had been scheduled and was an existing condition of employment. Neither of these facts exist in this case. *Cf. Catholic Medical Center v. NLRB,* 589 F.2d 1166, 1174 (2d Cir.1978).

8(a)(5) violation to challenge certification does so out of antiunion animosity. That conclusion does not necessarily follow, however. Challenge to certification is a necessary and entirely legitimate means of achieving review of perceived irregularity in representational elections. The mere fact that an employer who mounts such a challenge maintains, in the interim between the filing of an appeal and its disposition, a consistent opposition to bargaining does not of itself permit an inference of bad faith. In fact, as we have indicated in our discussion of the 8(a)(5) issue, an employer engaged in a technical challenge to union representation must maintain a consistency in its relations with the union prior to resolution of the certification issue.

 We emphasize that every time an employer engaged in a certification battle with a union representing less than its total workforce decides, during the pendency of the challenge, to bestow benefits on the remaining, independent members of its workforce, it has not *ipso facto* violated 8(a)(3). Discrimination of this sort violates the law only if it stems from improper motives. When an employer can demonstrate some other, lawful rationale for such disparate treatment, such as a substantial and legitimate business purpose, or even a desire to avoid the risk of an additional 8(a)(5) charge, it has not engaged in forbidden conduct.

 Peabody also challenges the breadth of the proscriptive language contained in the cease and desist order and the notice to be posted at Peabody's Will Scarlet mine. The Board, after considering the recommendation below that the order provide that Peabody would not "in any manner" interfere with its employees' section 7 rights, broadened the language still further to read "in any other manner." Peabody takes issue with both versions. It argues that its conduct was neither egregious nor widespread and that, therefore, the narrower language—"in any like or related manner"—is appropriate. We agree.

As a general rule, the Board is vested with broad discretionary power to fashion a remedy commensurate with the severity of the violation, *NLRB v. Seven-Up Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953); *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943), subject only to the proviso that the prescribed remedy "can be fairly said to effectuate the policies of the [National Labor Relations] Act." *Virginia Electric & Power,* 319 U.S. at 540, 63 S.Ct. at 1218 (1943). Where remedial orders of the type at issue here are concerned, however, the Board has recently announced a policy to restrict to certain limited situations employment of the broad proscriptive language employed here. In *Hickmott Foods, Inc.,* 242 N.L.R.B. 1357 (1979), a discriminatory discharge case, the Board reconsidered its regular practice of issuing sweeping remedial orders in every case. Finding automatic adoption of a broad order unwarranted and unnecessary for the effective enforcement of the Act, the Board adopted instead an approach by which every case would be individually analyzed to determine the severity of the illegal conduct. A narrow order requiring the offender to cease and desist from "in any like or related manner" restraining or coercing employees in the exercise of their section 7 rights would "usually" be appropriate. 242 N.L.R.B. at 1357. The broader order "is warranted only when a respondent is shown to have a proclivity to violate the Act, or has engaged in such widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *Id. See Western Pacific Roofing Co.,* 244 N.L. R.B. 501 n. 3 (1979). *See also Catholic Medical Center v. NLRB,* 589 F.2d 1166 (2d Cir.1978); *NLRB v. Process and Pollution Control Co.,* 588 F.2d 786 (10th Cir.1978).

In this case, the administrative law judge concluded that "the employer's repetition of the refusal to bargain violation, coupled with the addition of the conduct found discriminatory herein, demonstrates such a proclivity to violate the Act and a blatant disregard of the employees' section 7 rights as to warrant application of the Board's standard for broad proscriptive language."

Given our reversal of the substantive 8(a)(5) charge, however, the only refusal to bargain violation to consider in fashioning the remedial order is the technical 8(a)(5) charge. Because, as we have already noted, an employer must violate 8(a)(5) to gain judicial review of a Board certification, *see Pittsburgh Plate & Glass,* this type of technical violation cannot form the foundation for the imposition of such an extraordinary remedy. Moreover, although we have upheld the Board's findings as to the 8(a)(1) charges, it is important to note that all the acts leading to the charges were committed by one person, Menzie, who is no longer employed by the company. While this by no means absolves Peabody from responsibility for their effect, it does, we think, illuminate the question of whether the illegal conduct was so "egregious or widespread" as to merit the harsh penalty imposed by the Board. Finally, although we have affirmed the Board's 8(a)(3) findings, its conclusion that Peabody's motives were illegal was also based almost solely on Menzie's statements. Despite the fact that we have held such evidence sufficient to sustain the Board's findings, we are alert to the fact that the question is close. An equally plausible conclusion to be drawn from the evidence is that the acts of discrimination complained of here were motivated by precisely the rationale advanced by Peabody—the company believed that to extend the wage and benefit increases to the Will Scarlet clerks prior to resolution of the certification challenge would violate 8(a)(5) or jeopardize the future success of the certification litigation. Either way, however, there is insufficient evidence in the record to support a conclusion that the unusual, broad remedy adopted by the Board is warranted. Accordingly, that portion of the order is vacated and in its stead shall be substituted the narrower language prescribed in *Hickmott.* Specifically, that portion of the cease and desist order, and the corresponding portion of the notice, which provides that Peabody will not "in any other manner" interfere with, restrain or coerce its employees will be changed to read "in any like or related manner."

The Board's orders covered by the decision in 265 N.L.R.B. 13 are enforced in part, denied enforcement in part, and remanded for further proceedings consistent with this opinion.

BAILEY BROWN, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's opinion except that portion reversing the Board's decision that Peabody violated its duty to bargain when it unilaterally refused to extend benefit increases to the Will Scarlet clerks. Peabody's refusal to grant the increases created a disparity in the treatment of the Will Scarlet clerks and other Peabody employees including other warehouse clerks. I believe that this disparity, explained only by the Will Scarlet clerks' choice of the union, was a change in the condition of the clerks' employment about which Peabody must bargain. I also believe, contrary to the majority's reasoning, that limited bargaining over the benefit increases would not compromise or waive Peabody's initial challenge to the union's certification. The majority's ruling contradicts the spirit and interpretations of the statute and provides an incentive for protracted delays in certification challenges. Therefore, I respectfully dissent.

The cases following the Supreme Court's decision in *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), have given expansive meaning to the employer's duty to bargain over the terms and conditions of employment. The employer's duty is to maintain the dynamic status quo, effecting those changes that would have occurred absent the existence of the union. *See Eastern Maine Medical Center v. NLRB,* 658 F.2d 1, 8 (1st Cir.1981); *NLRB v. Allied Production Corp.,* 548 F.2d 644, 653 (6th Cir.1977). If an employer, without bargaining, departs from established practices by withholding benefits or benefit increases otherwise reasonably expected, the employer violates § 8(a)(5). R. GORMAN, BASIC TEXT ON LABOR LAW 450 (1976).

Although the decision to grant a particular benefit may rest ultimately with the

discretion of the employer, an employee may nevertheless form a reasonable expectation for the benefit based on past practices. This expectation, for the purposes of the duty to bargain, becomes part of the terms and conditions of employment. *NLRB v. Ralph Printing & Lithog. Co.,* 433 F.2d 1058, 1062 (8th Cir.1970), *cert. denied,* 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971). Thus, a unilateral change occurs when a traditional Christmas bonus is cancelled, *NLRB v. Exchange Parts,* 339 F.2d 829, 831 (5th Cir.1965), or reduced, *NLRB v. McCann Steel Co.,* 448 F.2d 277, 279 (6th Cir.1971). A wage increase announced or scheduled before a union election may also support a reasonable expectation. Failure to grant the increase without bargaining violates § 8(a)(5). *Allied Production Corp.,* 548 F.2d at 653.

On occasion, it may be difficult for an employer to determine what benefit increases are merely maintaining the status quo and what increases are a departure. The Board offers this reasonable rule:

> An employer's legal duty in deciding whether to grant benefits while a representation case is pending is to determine that question precisely as he would if a union were not in the picture. If the employer would have granted the benefits because of economic circumstances unrelated to union organization, the grant of those benefits will not violate the Act. On the other hand, if the employer's course is altered by virtue of the union's presence, then the employer has violated the Act, and this is true whether he confers benefits because of the union or withholds them because of the union.

*McCormick Longmeadow Stone Co.,* 158 N.L.R.B. 1237, 1242 (1966). But the difficulty of determining when an increase is consistent with the existing structure of wages and benefits does not excuse an employer from its duty to bargain. When faced with such indeterminacy, the clear solution is to give the union notice and an opportunity to bargain over the contemplated change. *NLRB v. United Aircraft Corp.,* 490 F.2d 1105, 1111 n. 6 (2d Cir.1973); *Eastern Maine Medical Center v. NLRB,* 658 F.2d 1, 8 n. 6 (1st Cir.1981). An employer who does not choose this course, but makes unilateral changes without bargaining, runs the risk that it will later be held to have violated the duty to bargain. *Allied Production Corp.,* 548 F.2d at 653.

In this case it is undisputed that the warehouse clerks at Peabody's other mines received all the benefit increases now in issue. The record also shows that the dental and vision care benefits were to apply to "all active employees." It is true that no evidence was submitted to support a finding that the benefits were consistent with a regular pattern in awarding benefits to Peabody's employees. Yet the record does support, as the majority acknowledges, a finding of a broad departure in the treatment of the Will Scarlet clerks from that of other Peabody employees, especially other warehouse clerks. This disparity—justified by the employer as necessary to avoid bargaining with the union but also produced, as the majority accepts, by anti-union animus—is a clear failure to maintain the dynamic status quo.[1]

The majority accepts the employer's reasoning that refusing the increase simply maintained the clerks' "existing wage structure." The majority would limit this structure to increases an employee could expect to receive based on a regular pattern in the receipt of the benefits. Yet an employee's expectation of increases in benefits addressed to "all active employees" and received by employees holding exactly the same positions in other parts of the company, is at least as reasonable as an expectation based on prior practice. The employer's obligation is to bargain in "good faith with respect to wages, hours, and other

---

1. In discussing the duty to bargain, the majority accepts the employer's explanation that it refused to grant the increases because to grant the increases would be a unilateral change in the clerks' employment conditions. Yet the majority later holds, in affirming the § 8(a)(3) violation, that the company was motivated not merely by its desire to test the union's certification but by an anti-union animosity.

*terms or conditions of employment."* Katz, 369 U.S. at 742–43, 82 S.Ct. at 1111 (emphasis added).[2] The conditions of employment include patterns of pay and benefits as between employees. Thus, a raise to maintain a pay differential between skilled and unskilled workers is an increase that maintains the status quo. *NLRB v. Ralph Printing & Lithog. Co.,* 433 F.2d at 1062. In this case, rather than maintain the position of the Will Scarlet clerks relative to other Peabody employees, the employer created a substantial disparity. Therefore, excluding the Will Scarlet clerks from company-wide benefits was a dramatic change in the condition of their employment in violation of § 8(a)(5).

Because Peabody, as I have argued above, changed the conditions of the clerks' employment by withholding an otherwise general benefit increase, granting the increase would have maintained the dynamic status quo and no bargaining would have been required. *See Ralph Printing & Lithog. Co.,* 433 F.2d at 1062. The majority holds, however, that extending the benefits would constitute a unilateral change. Any bargaining over the benefits, the majority adds, would have jeopardized or waived Peabody's objection to the union's certification. This argument, which is not essential to the majority's disposition of the § 8(a)(5) charge, lacks support in the case law and contradicts the policy of encouraging bargaining while recognition disputes are resolved.

The majority's reliance on *King Radio Corp. v. NLRB,* 398 F.2d 14 (10th Cir.1968) is misplaced. In that case, the employer, after the election and immediately after the Board denied its certification objection, "recognized the Union as the certified bargaining representative of the employees in the unit and entered into negotiations with the Union." *Id.* at 20. Because the employer had dropped its legal challenge, recognized the union, and entered into negotiations, the court held that the employer waived any later objection to the union's certification. In this case, Peabody initially refused to recognize the union and continued to assert its legal challenge to the union's certification. *King Radio,* therefore, is no authority for the majority's position that a company that maintains a legal challenge to a union's certification will compromise that challenge by limited bargaining on interim changes pending resolution of the certification claims.[3]

By lending credence to the waiver doctrine, the majority erects an unnecessary and unfortunate obstacle to the clear command of an employer's duty to bargain. In *Allied Production Corp.,* this court underscored the importance of an employer's duty to bargain, an obligation that is not suspended pending legal challenges to a union's status.

It is the election—the choice of the union as the employee's bargaining representative—that gives rise to the employer's duty to bargain. An employer's *objec-*

**2.** An employer's duty to bargain extends well beyond the "existing wage structure" to broader patterns in the treatment of employees. Subcontracting work ordinarily performed within a plant, for example, is a mandatory subject of bargaining. *Fibreboard Paper Prods. Corp.,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

**3.** I also find unpersuasive the majority's reliance on *NLRB v. Blades Mfg. Corp.,* 344 F.2d 998 (8th Cir.1965). There the court stated in dictum that the employer could have prejudiced its position by meeting with employee representatives to adjust grievances. In that case, the employer was contending that an earlier election rejecting union representation, which the Board had set aside, was valid. Pea-

body's refusal to bargain was not based on an earlier election that absolved it of the duty to bargain. Under our court's decision in *Allied Production Corp.,* 548 F.2d at 653, an employer's duty begins with the employee's choice of union representation. For Peabody, no prior decision of the employees complicated its duty to bargain. Because of the strong policy supporting the duty to bargain, I believe it is incorrect to extend the court's suggestion in *Blade's Mfg.* from the particular facts of that case into a broad waiver doctrine. Where an employer has preserved its challenge to certification, the law should not punish that employer for consulting with a union prior to changing the conditions of employment.

*tions to certification do not relieve it of that duty.*

548 F.2d at 653 (emphasis added). By requiring an employer to bargain as to changes in the terms and conditions of employment after an election of a union, the law discourages an employer from engaging in delays and actions intending to communicate to employees the futility of their organizing efforts.[4] It is inconsistent with this policy to hold, as the majority reasons, that an employer which fulfills its duty by limited bargaining over interim matters forecloses its objections to certification. By rejecting the waiver argument, our court would place a presumption in favor of bargaining, a position in line with national labor policy.[5] An employer could begin the bargaining process yet preserve its challenge to certification. By taking a contrary view, however, the majority offers employers a legal excuse to ignore the elected representatives of employees. This reduces the risk that an employer will be penalized for undercutting a union during the pendency of an attack on a union's certification and further rewards the long delays that already mark such proceedings.

The majority denies enforcement of the Board's broad proscriptive order because the employer did not violate its duty to bargain over the benefit changes and because Menzie, the principal offender, is no longer with the company. I must disagree. For the reasons set forth above, I believe that the employer did violate § 8(a)(5) by refusing to consult with the union over the benefit changes. Moreover, the company's refusal to grant the benefits, as the majority holds, was motivated by anti-union animus. The majority's holding implies that the management which made the decision to withhold the benefits shared the anti-union animus evidenced by Menzie's actions and statements. Therefore, Menzie's removal does not eliminate a basis for the Board's proscriptive order.

---

4. The dangers inherent in delay are increased where, as in this case, the employer may raise benefits for workers who are not members of the bargaining unit. *See Eastern Maine Medical Center v. NLRB,* 658 F.2d 1, 9 (1st Cir. 1981). The majority's ruling would permit benefit increases even for similarly situated employees unless there was a showing of anti-union animus as to violate § 8(a)(3).

5. The majority seeks to distinguish *NLRB v. United Aircraft Co.,* 490 F.2d 1105 (2d Cir. 1973), from this case. There the employer argued that it was in a dilemma about scheduled wage increases: to grant the increase might amount to a unilateral change and to withhold the increase might constitute a unilateral change. The Second Circuit replied that the way out of the alleged dilemma was to offer to bargain with the union before doing anything.

This decision is consistent with other cases that place a legal presumption in support of bargaining. The majority tries to escape this reasoning by arguing that a certification challenge was not present in *United Aircraft.* Yet the Second Circuit, in a subsequent case, held that the existence of a certification challenge does not alter the presumption in favor of bargaining. *Catholic Medical Center v. NLRB,* 589 F.2d 1166, 1174 (2d Cir.1978). The majority also attempts to limit its reasoning in the instant case to changes which do not affect existing conditions of employment. The majority's treatment of the waiver doctrine, however, does not lend itself to such a narrow reading, for it implies that limited bargaining, even where there is a unilateral change in employment conditions, would prejudice or waive a certification challenge.